No. 98,656

STATE OF KANSAS, *Appellee*, v. WILLIAM BENNINGTON, *Appellant*.

(264 P.3d 440)

504

Opinion filed October 28, 2011.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Lesley A. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: William Bennington appeals his convictions and sentences, raising three issues. First, he argues his right to confront his accuser was violated when the trial court admitted into evidence testimony of a bank employee and a sexual assault nurse examiner (SANE) regarding statements made to them by the victim, who died before the trial. Bennington also argues his convictions must be reversed because the prosecutor committed misconduct by violating an order in limine and by making improper comments during closing argument. Finally, he argues his sentences must be reversed because the court erred by imposing increased sentences based on a criminal history that was not proven to a jury beyond a reasonable doubt.

We reject most of Bennington's arguments, but we find merit in his argument that the victim's statements to the SANE, which were made in the presence of a law enforcement officer who asked questions and reported past events rather than information regarding an ongoing public safety or medical emergency, were testimonial and should not have been admitted. Applying the federal constitutional harmless error standard to determine if this error requires reversal of Bennington's convictions, we affirm some of Bennington's convictions—aggravated burglary, aggravated robbery, aggravated kidnapping, rape, and two counts of criminal use of a financial card—but reverse his convictions on two aggravated criminal sodomy counts because we determine there is a reasonable possibility the error impacted the verdicts on those charges.

## FACTS AND PROCEDURAL BACKGROUND

In the fall of 2003, V.B., a 77-year-old female, was sexually attacked and robbed in her home. Bennington was identified through

a photo taken at an automated teller machine (ATM) when V.B.'s financial card was used after the aggravated burglary; the financial card had been stolen during the robbery, and V.B. had been forced to provide her personal identification number (PIN). When DNA evidence found at the scene of the crime matched Bennington's profile, he was charged with aggravated burglary, in violation of K.S.A. 21-3716; aggravated robbery, in violation of K.S.A. 21-3427; aggravated kidnapping, in violation of K.S.A. 21-3421; rape, in violation of K.S.A. 21-3502(a)(1)(A); two counts of aggravated criminal sodomy, in violation of K.S.A. 21-3506(a)(3)(A); and two misdemeanor counts of criminal use of a financial card, in violation of K.S.A. 21-3729(a)(1).

V.B. had a stroke and died before Bennington's jury trial, but she had related the events of the incident in some detail to her niece, to a SANE at the hospital, and, more generally, on a claim form submitted to her bank in reporting the unauthorized use of her financial card. Through a pretrial "Motion to Exclude Testimony of V.B.," Bennington sought to exclude evidence of any statements made by V.B.; his objections were based on his confrontation rights articulated by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 148 L. Ed. 2d 177 (2004). The trial court denied the motion.

A jury found Bennington guilty of all charges. He moved unsuccessfully for judgment of acquittal and a new trial on the basis of the purportedly erroneous admission of V.B.'s statements. At sentencing, Bennington received consecutive sentences on all counts, totaling 1,812 months' incarceration.

On direct appeal, the Court of Appeals determined V.B.'s statement to her bank was nontestimonial and its admission was not error. The Court of Appeals did not resolve the question of whether the statements to the SANE were testimonial, holding that even if the admission was erroneous, any error was harmless. The Court of Appeals rejected Bennington's arguments regarding prosecutorial misconduct and sentencing error, ultimately affirming all convictions and sentences. *State v. Bennington*, No. 98,656, 2009 WL 981683 (Kan. App. 2009) (unpublished opinion).

This court granted Bennington's petition for review and has jurisdiction pursuant to K.S.A. 22-3602(e) (petition for review) and K.S.A. 20-3018(b) (same).

More facts and details of the Court of Appeals' decision will be provided as necessary to the analysis.

## CONFRONTATION RIGHTS

Because V.B. died before the trial, she was unavailable to testify. Her statements to her bank and to the SANE—the only statements that are discussed in the petition for review and are before us—were clearly hearsay. Bennington had no opportunity to cross-examine V.B. regarding the statements. Consequently, Bennington argues his confrontation rights under the Sixth Amendment to the United States Constitution were violated.

*Standard of Review*

Bennington's arguments are subject to a de novo standard of review because he challenges the legal basis of the trial court's admission of evidence under the Confrontation Clause of the Sixth Amendment to the United States Constitution. *State v. Dukes*, 290 Kan. 485, 487, 231 P.3d 558 (2010) (de novo standard applies to review of legal basis of admission of evidence); *State v. Appleby*, 289 Kan. 1017, 1054-55, 221 P.3d 525 (2009) (same); *State v. Henderson*, 284 Kan. 267, 276, 160 P.3d 776 (2007) (de novo standard applies to determination of whether the right of confrontation has been violated).

These same arguments are raised in *State v. Miller*, 293 Kan. 535, 264 P.3d 461 (2011). Consequently, we include our discussion of the general legal principles in both opinions.

*General Legal Principles*

The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. That guarantee applies to criminal defendants in both federal and state prosecutions. See *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (Sixth Amendment applicable to states through the Fourteenth Amendment). Similarly, a criminal de-

fendant in Kansas has the right to "meet the witnesses face to face." Kan. Const. Bill of Rights, § 10.

In a landmark decision, *Crawford*, 541 U.S. 36, the United States Supreme Court significantly revised the rules related to an analysis of whether the admission of hearsay statements violates the Confrontation Clause. Specifically, *Crawford* held a witness' testimonial statements against a defendant are inadmissible unless the witness appears at trial or, if the witness is unavailable to testify at trial, the defendant had a prior opportunity for cross-examination. If the statements are nontestimonial, the Confrontation Clause guarantees are not implicated. *Crawford*, 541 U.S. at 68; see *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Appleby*, 289 Kan. at 1055; *State v. Brown*, 285 Kan. 261, 285, 173 P.3d 612 (2007); *State v. Davis*, 283 Kan. 569, 575, 158 P.3d 317 (2007). Consequently, post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the hearsay statement at issue is testimonial in nature. *Appleby*, 289 Kan. at 1055; *Brown*, 285 Kan. at 285.

*Crawford* did not explicitly define the term "testimonial." *Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). But the Supreme Court did state that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68; see *Davis*, 547 U.S. at 822 (in context of law enforcement interrogations, statements are nontestimonial when made under circumstances objectively indicating that the primary purpose of the interrogation is to enable law enforcement assistance to meet an ongoing emergency).

*Crawford*, *Davis*, and the case consolidated with *Davis* for decision, *Hammon v. Indiana*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), dealt with statements made to law enforcement officers soon after a criminal incident. In *Crawford*, Sylvia Crawford was interviewed by law enforcement officers after her husband stabbed a man who had allegedly attempted to rape her; Sylvia was in custody at the time. The Supreme Court concluded Sylvia's statements were testimonial and should not have been admitted in

her husband's trial after she asserted her spousal privilege. *Crawford*, 541 U.S. at 65-68. In reaching this holding the *Crawford* Court noted: "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51.

This broad guidance was clarified in *Davis* where the Court explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the [interrogation's] primary purpose . . . is to enable police assistance to meet an ongoing emergency," but they "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. Thus, a recording of a 911 call describing an ongoing domestic disturbance was nontestimonial in *Davis*, where the victim's "elicited statements were necessary to be able to *resolve* [the ongoing] emergency," and the statements were not formal. *Davis*, 547 U.S. at 827.

On the other hand, the statements at issue in *Hammon* were testimonial, where the victim was interviewed after the domestic disturbance in a room separate from her assailant and "deliberately recounted, in response to police questioning," the past events. *Davis*, 547 U.S. at 830. Because at the time of the interrogation any emergency had ceased, "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Davis*, 547 U.S. at 830.

Based principally on the decisions in *Crawford*, *Davis*, and *Hammon*, in *Brown*, 285 Kan. 261, this court established four factors to be considered in determining when evidence is testimonial. While the *Brown* test remains a useful iteration of some of the considerations found in the Supreme Court's decisions, the Court provided further clarification in four subsequent cases: *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *Michigan v. Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); *Melendez-Diaz*, 557 U.S. 305; and *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008).

As further discussed, in *Bullcoming, Melendez-Diaz*, and *Giles*, the Court indicated that statements made to medical professionals during the course of receiving medical treatment and statements made as part of most business records are nontestimonial.

In the earliest of these cases, *Giles*, the Court noted: "[O]nly *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and *statements to physicians in the course of receiving treatment would be excluded,* if at all, only by hearsay rules." (Emphasis added.) *Giles*, 554 U.S. at 376.

*Bullcoming* and *Melendez-Diaz* discussed the nontestimonial nature of most business records, which would include medical records. The Court held there were exceptions to this general rule, however. The specific question in *Melendez-Diaz*, was whether the defendant' right to confrontation was violated by the admission of an affidavit of a forensic lab analyst who had tested material seized by law enforcement officers and determined the material was cocaine. In holding the affidavit was testimonial, the Court rejected the argument that the affidavit was nontestimonial because it was a business record of the laboratory. The Court noted that "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status," except "if the regularly conducted business activity is the production of evidence for use at trial." *Melendez-Diaz*, 557 U.S. at 321.

Following the decision in *Melendez-Diaz*, the Court in *Bullcoming* considered whether a blood-alcohol concentration report and an officer's certification of the test results were testimonial. The Court reiterated the general rule that business records are nontestimonial but noted the exception for records produced as evidence for trial. Because of the exception, the Court concluded the analyst who prepared the report and the officer who completed the certification had to be subject to cross-examination because the documents were prepared in anticipation of prosecution. *Bullcoming*, 131 S. Ct. at 2717.

The discussions in *Giles, Melendez-Diaz*, and *Bullcoming* suggest a general rule that statements made to health care professionals during the course of treatment and recorded in medical records

and statements in other business records would generally not be testimonial because the purpose of such statements is not to produce evidence for use at trial. This point is reiterated in *Bryant*, 562 U.S. 344, which makes numerous points relevant to our inquiry.

In *Bryant*, law enforcement officers responded to a gas station parking lot. A mortally wounded gunshot victim had driven himself to the lot from his home where he had been shot. On questioning by the officers, the victim asked for medical attention and identified his shooter and the location of his shooting. Reviewing the decisions in *Crawford*, *Davis*, and *Hammon*, the Court explained the nature of testimonial statements, stating:

> "[T]he most important instances in which the Clause restricts the introduction of out-of-court statements are those in which *state actors* are involved in a *formal*, out-of-court interrogation of a witness to obtain evidence for trial. [Citation omitted.] Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When, as in *Davis*, the *primary purpose* of an interrogation is to respond to an *'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause.* But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. *In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant.* Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." (Emphasis added.) *Bryant*, 562 U.S. at 358-59.

Despite the reference to "state actors," the Court, as it had in *Davis*, included a footnote referring to the possibility of statements being testimonial if made to someone other than a law enforcement officer. The *Bryant* Court noted that the *Davis* Court had determined 911 operators " 'may at least be agents of law enforcement when they conduct interrogations of 911 callers,' and therefore 'consider[ed] their acts to be acts of the police' for purposes of the opinion." (Emphasis added.) *Bryant*, 562 U.S. at 357-58 n.3 (quoting *Davis*, 547 U.S. at 823 n.2); see *Bryant*, 562 U.S. at 379 (Scalia, J.,

dissenting) ("The identity of an interrogator, and the content and tenor of his questions," can illuminate the primary purpose of the interrogation.). Because the victim in *Bryant* had spoken directly to State actors, *i.e.*, law enforcement officers, the *Bryant* Court noted it did not need to further address that issue. *Bryant*, 562 U.S. at 357-58.

But the circumstances of the case required "additional clarification with regard to what *Davis* meant by 'the primary purpose' of the interrogation is 'to enable police assistance to meet an ongoing emergency.' " *Bryant*, 562 U.S. at 359 (quoting *Davis*, 547 U.S. at 822). As part of this clarification, the *Bryant* Court provided guidance on how to determine the primary purpose of an interrogation, explaining the determination requires "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties." *Bryant*, 562 U.S. at 360. Some relevant factors listed by the Court were whether the encounter occurs "at or near the scene of the crime versus at a police station" or "during an ongoing emergency or afterwards." *Bryant*, 562 U.S. at 360. The Court emphasized the circumstances that determine the primary purpose of an interview "are clearly matters of objective fact." Because the focus is on objective facts, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at 360.

The most important objective fact, according to the *Bryant* Court, is whether there was an " 'ongoing emergency' " at the time the statements were made to law enforcement officers. If the focus was on an emergency, the Court reasoned, the participants were focused on " 'end[ing] a threatening situation' " rather than " 'prov[ing] past events potentially relevant to later criminal prosecution.' " *Bryant*, 562 U.S. at 361 (quoting *Davis*, 547 U.S. at 822, 832). The *Bryant* Court explained the rationale for the distinction by stating: "Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the

Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Bryant*, 562 U.S. at 361.

The Court reasoned this rule was similar to the recognition of reliability inherent in the excited utterance exception to hearsay. In a footnote, the Court observed there were other hearsay exceptions which "similarly rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions." *Bryant*, 562 U.S. at 362 n.9. As relevant to Bennington's argument in this case, the Court cited the Federal Rule of Evidence 803(4) relating to a hearsay exception for statements made for purposes of medical diagnosis or treatment and also cited the following authorities:

"*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S.Ct., at 2539-2540 ('Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial'); *Giles v. California*, 554 U.S., at 376, 128 S.Ct. 2678 (noting in the context of domestic violence that '[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules'); *Crawford*, 541 U.S., at 56, 124 S.Ct. 1354 ('Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.')." *Bryant*, 562 U.S. at 362 n.9.

With those general principles stated, the *Bryant* Court turned to the specifics of the "highly context-dependent inquiry" of whether there was an ongoing emergency when officers encountered the shooting victim in the parking lot. *Bryant*, 562 U.S. at 363. One circumstance evaluated by the Court was whether there was a continuing threat. The Court observed that *Davis* and *Hammon* involved domestic abuse situations in which the perpetrator was known and was not likely to be a threat to the general public or law enforcement. *Crawford*, the Court noted, related to a resolved situation; Sylvia Crawford's husband was the alleged aggressor and was under arrest. In contrast, in *Bryant*, it was not known if the perpetrator was a threat to the general public, the

victim, the officers, or emergency personnel. See *Bryant*, 562 U.S. at 356, 363-64, 371-73.

Another consideration, according to the Court, is the type of weapon used in the commission of the crime. The Court found it significant that a gun had been used in *Bryant* as distinguished from a knife in *Crawford* and fists and hands in *Davis* and *Hammon*. *Bryant*, 562 U.S. at 363-64.

Additionally, the *Bryant* Court determined the Michigan Supreme Court's failure to appreciate the "context-dependant nature of our *Davis* decision" led it to erroneously conclude the medical condition of a declarant is irrelevant. The Court stated: "The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Bryant*, 562 U.S. at 364-65. Applying that conclusion to the facts of the case before it, the *Bryant* Court noted the victim was in pain, was struggling to breathe, and was repeatedly asking when medical personnel would arrive. These circumstances weighed in favor of an objective conclusion that the primary purpose of the statements was not to aid in the future prosecution for the crime. *Bryant*, 562 U.S. at 374.

The *Bryant* Court then noted that while the existence of an ongoing emergency is an important factor in determining the primary purpose of a statement, there are other factors, including the formality of the encounter that must also be considered. The Court stated:

"Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution,' [citation omitted,] informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. [Citation omitted.]" *Bryant*, 562 U.S. at 366.

The Court noted the circumstances of *Bryant*—statements made in an exposed, public area, prior to the arrival of emergency medical services, and made in a disorganized fashion—distinguished the statements from those made under the formal setting of a sta-

tionhouse interrogation as in *Crawford*. *Bryant*, 562 U.S. at 366. The Court did not discuss or distinguish the circumstances of *Hammon*, where the statements were made at the scene of the crime—the home of the victim and her assailant. See *Davis*, 547 U.S. at 819-20.

Next, the *Bryant* Court noted that "[i]n addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Bryant*, 562 U.S. at 367. The Court stated this combined approach ameliorates problems that could arise from looking solely to one participant, specifically the problem of "mixed motives," which both an interrogator and a declarant are likely to have. For example, the desire of the victim to have the threat to her and other potential victims cease "does not necessarily mean that the victim wants or envisions prosecution of the assailant." *Bryant*, 562 U.S. at 368. The Court cautioned the consideration of statements and actions should not transform the inquiry into a subjective evaluation, stating: "The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim—circumstances that prominently include the victim's physical state." *Bryant*, 562 U.S. at 369. In this regard the victim's medical condition and the nature of the officer's questions were significant. The Court observed the questions asked by the officers in *Bryant*—" 'what had happened, who had shot him, and where the shooting occurred,' [citation omitted]"—were the type of questions necessary to allow the officers to assess the danger to themselves, the victim, and the public. *Bryant*, 562 U.S. at 376.

The Court also reiterated a point made in *Davis*: What starts as an emergency may transition to a nonemergency, in which case some statements might be admissible while others are not. The Court explained:

"As we recognized in *Davis*, 'a conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements.' [Citation omitted.] This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a

public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.' " *Bryant*, 562 U.S. at 365-66 (quoting *Davis*, 547 U.S. at 828-29).

Ultimately, under the particular facts in *Bryant*, the Court concluded the "circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' " *Bryant*, 562 U.S. at 377-78 (quoting *Davis*, 547 U.S. at 822). Consequently, the victim's "identification and description of the shooter and the location of the shooting were not testimonial hearsay," the Court concluded. *Bryant*, 562 U.S. at 378.

### V.B.'s Statement to Bank

Turning to the specifics of Bennington's appeal, this "highly context-dependent inquiry" requires us to conduct an objective analysis of the circumstances of V.B.'s statement to her bank and to the SANE, considering such factors as whether the interrogator was a State actor or agent, whether there was an ongoing emergency, whether the encounter was formal, and whether the statements and actions of both V.B. and the interrogator reflect a prosecutorial purpose.

We first consider whether the trial court erred in denying Bennington's motion to exclude from evidence a written statement submitted by V.B. to her bank. In denying the motion, the trial court stated on the record that the statement

"was certainly not submitted for purposes of assisting law enforcement officers in gathering information to apprehend the culprit in the case, but rather was for the banking purposes, to notify the bank of the improper withdrawal of funds from [V.B.'s] account so that [the Bank] could properly credit her account, [so the Bank] could handle it for a business transaction. . . . [T]he purpose of it was not testimonial in nature."

At trial, over defense counsel's objection, the security director for the bank testified regarding V.B.'s written statement. The se-

curity director testified the Wichita Police Department notified the bank that V.B.'s financial card might have been used without her permission. Two days later, V.B. went into the bank and signed a form indicating her card was stolen and she was "forced to give the PIN number." The bank's security director testified that "two withdrawals were successfully made," totaling $500. V.B.'s statement was made on a standard form issued by the bank and was maintained in the ordinary course of the bank's business. Based on these facts, the Court of Appeals affirmed the trial court's ruling that the statement was nontestimonial. *State v. Bennington*, No. 98,656, 2009 WL 981683, at *7 (Kan. App. 2009) (unpublished opinion).

In his petition for review, Bennington argues, unconvincingly, that the written statement was testimonial primarily because, according to the bank's security director, the bank sent a copy of the signed form to law enforcement. However, whether law enforcement had access to the statement, while a factor, is not determinative of whether the statement was testimonial. Rather, the focus is whether the statement was made for the primary purpose of creating an out-of-court substitute for trial testimony, and, here, there is no indication that was a primary, or even a secondary, purpose of the statement. There is no indication V.B. was aware the statement would be shared with law enforcement officers, especially in light of the fact V.B. had already given the same information to investigating officers. Instead, V.B. made the statement in order to document with her bank that her financial card had been stolen and to seek credit of amounts withdrawn through unauthorized usage. In turn, the bank needed the document for its internal processing. Other significant circumstances are that the statement was made on a bank form, was given to a non-State actor, and was a part of the records created in the usual course of the bank's business. As such, the statement was of the type referred to in *Bryant* as one which by its nature was "made for a purpose other than use in a prosecution." *Bryant*, 562 U.S. at 362 n.9; see K.S.A. 60-460(m) (business records hearsay exception).

Consequently, we agree with the conclusion of the trial court and the Court of Appeals that V.B.'s written statement to the bank was nontestimonial.

*Statements to the SANE*

The other *Crawford* issue relates to the testimony of the SANE regarding V.B.'s statements in the hospital emergency room, where V.B. was taken by ambulance after law enforcement officers arrived at the scene. Bennington made a continuing Confrontation Clause objection at the outset of the SANE's testimony to any statements made by V.B. to the SANE. Some additional facts are necessary to understand the context of the statements.

The SANE explained on direct examination that before conducting a physical examination, she took a "history from the patient, an account of what happened to" her. The SANE then completed a head-to-toe assessment, a detailed genitalia exam, and then collected forensic evidence.

In testimony that sets this case apart from a situation where statements are made solely to a health care professional, the SANE explained a law enforcement officer was present during V.B.'s "history." While the SANE asked for a narrative statement, asking V.B. to explain what had happened, the officer also asked V.B. a few specific questions. The SANE wrote down V.B.'s statements, which incorporated her responses to all questions. The SANE's notes were recorded in the medical chart; in those notes, one cannot make a distinction between the statements to the SANE and the statements to the officer.

After the history had been obtained, V.B. was moved to a different location where the second step, a sexual assault assessment, was conducted, which entailed a head-to-toe examination and a detailed examination of V.B.'s genitalia. Bennington did not object during the SANE's testimony regarding physical findings or to the admission of photographs taken by the SANE during the physical examination. The standing objection made to the SANE's testimony also did not cover any physical findings or the photographs, as these observations were made by the SANE who was confronted by Bennington before the jury. See K.S.A. 60-404 (contemporaneous objection statute); *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 5, 245 P.3d 1030 (2011) (party cannot object to the introduction of evidence on one ground at trial and then assert another ground

on appeal); *State v. Dukes*, 290 Kan. 485, 487-88, 231 P.3d 558 (2010) (same); *State v. King*, 288 Kan. 333, 341-42, 346-48, 204 P.3d 585 (2009) (timely and specific objection preserves issues related to admission of evidence for appeal).

During this portion of the examination, the SANE completed a Kansas Bureau of Investigation (KBI) sexual assault evidence kit in compliance with the procedures established by the KBI and the Kansas Department of Health and Environment pursuant to K.S.A. 2010 Supp. 65-448. One form within this kit was an anatomical drawing of the external female genitalia. The SANE recorded her observations of physical injuries on this form. Defense counsel specifically stated there were no objections to the admission of this form as an exhibit.

Another form in the KBI kit was a questionnaire, which listed questions asking about the nature of the assault, the specific time of the assault, the name of the perpetrator, and a description of the perpetrator. The victim was also asked whether the victim had other sexual relations in the last 72 hours. The SANE explained the last question was helpful when analyzing the import of forensic evidence.

Regarding the information supplied by V.B. in response to these questions, the SANE testified that V.B. "reported penetration in all three areas, the genital, anal and oral." Bennington did not state a separate objection to testimony regarding V.B.'s statements as recorded on this form.

*State's Focus Misplaced*

The State argues V.B.'s statements were nontestimonial because they were made to the SANE as a medical professional, not as a government official, and they were made to provide the SANE with information for treatment purposes, not for prosecution. The State also argues that the interview was not subject to any of the formalities and procedures otherwise associated with testimonial hearsay.

These arguments might be valid in other circumstances where a SANE assesses the medical condition of a sexual assault victim and provides treatment. For example, in light of the circumstances

presented in *State v. Miller*, 293 Kan. 535, 264 P.3d 461 (2011), we held that the statements of a 4-year-old victim to a SANE were nontestimonial because the primary purpose of the questions and statements were medical treatment, not prosecution. That context-dependent conclusion was based on the circumstances of the child victim complaining of discomfort, the victim's mother deciding to seek medical treatment independent of a request by law enforcement officers for an examination, and the SANE providing medical treatment. The same conclusion is suggested by some of the circumstances in this case, primarily the facts that V.B. was taken by ambulance to the hospital and sought and received medical treatment. This case, however, presents the circumstances of the statements being given either (1) to a law enforcement officer and a SANE or (2) in response to questions prepared by the KBI that were asked by the SANE. These factors dictate the outcome of the issue in this case.

In *Miller*, 293 Kan. at 565-67, we cite caselaw from other jurisdictions on the issue of whether statements to a SANE are testimonial. We will not repeat that discussion here but note that in synthesizing those decisions we concluded "if a law enforcement officer participates in the questioning, there is a strong trend toward finding the victim's statements testimonial." *Miller*, 293 Kan. at 567. We agree with the decisions reaching this result, at least under the circumstances of this case. We further note that these holdings are consistent with our decision in *State v. Henderson*, 284 Kan. 267, 160 P.3d 776 (2007). In that case, a child victim was primarily interviewed by a state-employed social worker, who was gathering information for potential action related to child protection services. However, a law enforcement officer "sat in on the interview, and participated in asking several clarifying questions of [the victim]." *Henderson*, 284 Kan. at 289. This participation, along with the officer's continuous involvement in the process and other aspects of the investigation from the start, was an "important" consideration leading to our holding that the victim's statements were testimonial. See *Henderson*, 284 Kan. at 289-90.

In this case, the presence of the law enforcement officer during the initial taking of a history from V.B. blurs the "primary purpose"

of the interview. Obviously, one purpose of the interview was for medical purposes; the SANE testified the first step of an examination is to "obtain information on exactly what happened to [the victim], so then in turn you can assess for [the] types of injuries that may have been sustained." Yet, the presence of an officer is not necessary for medical purposes.

Rather, the officer was listening to V.B.'s account of past events, with an eye toward gathering information relevant to prosecution. The officer, who asked questions, gathered this information in a formal setting at a time when there was no indication of an ongoing public safety or law enforcement emergency; the perpetrator had fled hours before the interview. In this regard, the situation was much like that in *Hammon v. Indiana*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), where the law enforcement emergency had been resolved and the victim was being asked to recount past facts. The fact the officer interjected questions makes it apparent from an objective viewpoint that the information was also being sought for potential use in a subsequent prosecution.

The fact these statements were also heard by a SANE does not alter the objective circumstances that suggest a primary purpose was prosecution, even if there was a dual purpose of assessment for medical purposes. In *Miller*, 293 Kan. at 574, we concluded that an analysis of the testimonial nature of statements must at times be analyzed question by question because the purpose of the interview may transition. In this case, we are unable to make such fine distinctions because the SANE's narrative of V.B.'s statements does not distinguish between information given in response to a question asked by the officer or by the SANE.

Consequently, because the interview was conducted in concert with the officer who asked questions, V.B. was asked about past events, there was not an ongoing public safety or medical emergency, and the statement was given in a formal setting, we hold the admission of the SANE's testimony about the statements made in the presence of a law enforcement officer violated Bennington's confrontation rights.

V.B. made other statements outside the presence of the officer, however, during the second stage of the SANE's interview of V.B.

As previously discussed, it was during this second stage that the SANE completed the KBI's questionnaire.

The Court of Appeals separately discussed the two phases of the statements and determined Bennington's objection to the admission of V.B.'s second-stage statements had not been preserved. The Court of Appeals explained:

"Finally, when [the SANE] related this aspect of her work, there was no objection to her testimony; the vague 'continuing objection' asserted at the outset of [the SANE's] testimony during step one in the process cannot be construed as applicable to the later and attenuated step two testimony without at least a reminder to the court of the general applicability of the prior 'continuing' objection. See *In re C.E.M.*, No. 96,914, unpublished opinion filed March 2, 2007, *rev. denied* 284 Kan. 945 (2007)[, slip op. at 6] (vague continuing objection deemed inapplicable to attenuated testimony without reminder of continuing applicability); [see also] *State v. Torrez*, 280 Kan. 309, 319, 121 P.3d 429 (2005) (a timely and specific objection is necessary to preserve an issue for appeal). The dispute on appeal focuses upon what the victim told [the SANE] during the step one 'history.' The distinction between evidence resulting from step one and that resulting from step two is critical to our analysis." *State v. Bennington*, No. 98,656, 2009 WL 981683, at *2 (Kan. App. 2009) (unpublished opinion).

Despite this explanation by the Court of Appeals, the source of its insistence that a continuing objection needed to be renewed because V.B. made these second-stage statements in a different location and different phase of the examination is unclear. Until the Court of Appeals' decision, no one had attached legal significance to the stages of the examination. Although we also think the stages are legally significant, we fail to see why a continuing objection to *all* statements of V.B. on confrontation grounds, reasserted during the SANE's testimony, did not sufficiently preserve an objection to *all* statements of V.B., regardless of whether made in the initial history portion of the examination or in response to questions on the KBI form. Consequently, we conclude Bennington preserved the issue of whether all V.B.'s statements, including the stage-two statements, were admissible.

Nevertheless, we agree with the Court of Appeals' conclusion that there is legal significance to the fact these stage-two statements were given in response to questions through which the KBI sought information significant to the investigation and later prosecution of

a crime. Even though the questions were verbally posed by the SANE, the source was the KBI and the questions asked who, when, where, and other specifics relating to the elements of potential crimes. These circumstances indicate the primary purpose of the interrogation was to seek information for later prosecution of crimes. Significantly, K.S.A. 2010 Supp. 65-448 states, in part:

"(a) *Upon the request of any law enforcement officer and with the written consent* of the reported victim, or upon the request of the victim, any physician, a licensed physician assistant, who has been specially trained in performing sexual assault evidence collection, or a registered professional nurse, who has been specially trained in performing sexual assault evidence collection, on call or on duty at a medical care facility of this state, as defined by subsection (h) of K.S.A. 65-425, and amendments thereto, shall examine persons who may be victims of sexual offenses . . . using Kansas bureau of investigation sexual assault evidence collection kits or similar kits approved by the Kansas bureau of investigation, for the purposes of gathering evidence of any such crime. If an examination has taken *place solely upon the request of the victim, the medical care facility shall not notify any law enforcement agency without the written consent* of the victim, unless otherwise required by law. . . . The department of health and environment, in cooperation with the Kansas bureau of investigation, shall establish procedures for gathering evidence pursuant to this section." (Emphasis added.)

In this case, the record does not establish whether a law enforcement officer requested the examination or whether V.B. consented to the release of the information to law enforcement. Nevertheless, because the SANE was complying with the protocol established pursuant to K.S.A. 2010 Supp. 65-448 and was seeking information in addition to the history that she said she used for diagnostic purposes, her actions reflect that the primary purpose of posing the questions was to gather information for prosecution. Because the record on appeal is silent regarding whether V.B. consented to the information being provided to law enforcement, we decline to project the impact the consent would have had on V.B.'s intent and actions. Even without the consent, from an objective standpoint, a patient would understand questions that ask for a description of the perpetrator and similar information did not need to be asked for purposes of medical treatment. Rather, under the circumstances of this case, V.B. was reporting past events that were not

related to an ongoing public safety emergency or to her need for medical treatment.

Moreover, when a SANE—even one who is a non-State actor—follows the procedures for gathering evidence pursuant to K.S.A. 2010 Supp. 65-448 and asks questions prepared by the KBI, the SANE acts as an agent of law enforcement. See *Michigan v. Bryant*, 562 U.S. 305, 359 n.3, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (noting non-State actors may be considered agents for purposes of analysis of whether statements are testimonial); *Davis v. Washington*, 547 U.S. 813, 823 n. 2, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (same). Again, under some circumstances, there may be a transition to nontestimonial statements. But there is no indication of any such circumstances in this case.

As a result, we conclude that V.B.'s statements were testimonial under the circumstances of this case where an officer was present and asked questions of V.B. in stage one and the KBI prepared questions that the SANE asked during stage two of V.B.'s statements.

*Harmless Error*

Having found error, we must next consider whether the error was harmless error. "Violation of the Confrontation Clause is subject to analysis under the federal harmless error rule." *State v. Nguyen*, 281 Kan. 702, Syl. ¶ 6, 133 P.3d 1259 (2006). To declare a federal constitutional error harmless under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), an appellate court must be persuaded beyond a reasonable doubt that the error did not affect the trial's outcome in light of the entire record, *i.e.*, there was no reasonable possibility that the error affected the verdict. The prosecution—the party benefiting from the error—bears the burden of showing that the error was harmless. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). Where, as here, there are multiple counts and the evidence as to each count differs, an appellate court must proceed by applying the *Chapman* federal harmless error standard to each count. See *Paige v. United States*, 25 A.3d 74, 82 (D.C. 2011).

As we apply this test to the trial evidence, we conclude there was overwhelming evidence that Bennington was the perpetrator and V.B.'s statements to the SANE did not impact that identification in any significant way. (Her response to the KBI questions regarding identity was "unknown," and her physical description was too vague to lead to identification.) Rather, DNA evidence implicated Bennington in the sex crimes, and the ATM photograph identified him as the person using V.B.'s financial card.

Additionally, the SANE's testimony played little, if any, role in proving the State's case regarding the aggravated burglary and aggravated robbery. V.B.'s statement to the bank established the card was taken when someone broke into her house and she was forced to provide her PIN. She also reported the card was used on two occasions to withdraw money from her bank account without her consent. The first officer on the scene found that V.B.'s phone line had been torn or cut, papers and credit cards were scattered, and drawers were opened. Other officers found a window had been forced open. V.B.'s niece testified V.B. told her the man broke into her house, pointed a gun at her head, took her financial cards, forced her to give him her bank PIN, and took all of her good jewelry. This was the primary evidence used to prove the charges of aggravated burglary, aggravated robbery, and criminal use of a financial card. We are convinced beyond a reasonable doubt that there was no reasonable possibility the SANE's testimony regarding V.B.'s statements affected the verdicts on these charges.

Regarding the charges of aggravated kidnapping and rape, V.B.'s history statements to the SANE were cumulative of other evidence admitted at trial. V.B.'s next door neighbor testified there was a loud banging on his door. He found V.B., naked from the waist down, her hands bound behind her back, and her mouth gagged. He could tell her legs had also been bound because he could see the indentations and bluish discoloration cause by restricted circulation.

Then, V.B.'s niece testified:

"She told me that she was awakened in the night with a gun to her head, and she said I just prayed all the time, and that a man was in her house. He had on a stocking hat and she said she couldn't really see his face very well. And he tried

to rape her vaginally, and then he turned her over and tried to insert his penis in her rectum, and he also tried to put it in her mouth or did. And then he tied her hands and feet all up behind her."

In addition, there was physical evidence, including injuries observed by V.B.'s neighbor and V.B.'s niece, who reported her aunt was sore and uncomfortable for more than a week to the point to being unable to tolerate a bath. More significant were the SANE's observations of V.B.'s injuries and physical findings substantiating the charges of aggravated kidnapping and rape. The SANE observed marks on V.B.'s face, arms, back, legs, and ankles, which she described to the jury. These injuries were also documented with photographs, which allowed the jury to observe ligature markings corresponding to the neighbor's descriptions. The photographs also documented other abrasions and bruises on V.B.'s forearms, elbows, ankles, and back.

Also, the SANE documented injuries to the external female genitalia by making notations on a diagram. She testified in detail regarding her observations, describing the injuries and explaining their significance to the jury. She first described tears to the skin of the labia minora, which she opined were caused by blunt or direct force. There was also bruising around the urethra opening and a 1-centimeter tear in that area. Similarly, the vaginal opening was marked with a tear and bruising. Explaining this injury, the SANE reported that such an injury results from blunt force, such as when "[a]n object is directly impacting that skin tissue" and is "generally" consistent with penile or attempted penile insertion. The SANE explained the examination did not include looking into V.B.'s cervix because "it was just too painful for her."

These physical observations and opinions, when combined with the niece's description of what happened to V.B. and the neighbor's description of the binding and gagging, provided strong evidence of aggravated kidnapping and rape. See K.S.A. 21-3420 (defining kidnapping as "taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person" for a criminal purpose); K.S.A. 21-3421 (defining aggravated kidnapping is kidnapping as defined in K.S.A. 21-3420 when "bodily harm is inflicted upon the person kidnapped"); K.S.A. 21-3502(a)(1)(4)

(defining rape as sexual intercourse without consent; victim overcome by force or fear); *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994) ("Penetration is an element of rape, but any penetration, however slight, is sufficient. To establish this element, actual penetration of the vagina or rupturing of the hymen is not required; penetration of the vulva or labia is sufficient.").Without the SANE's testimony there is strong evidence that V.B. was confined, was threatened with a gun, suffered bodily injury, and experienced penetration of the labia. In light of this evidence, we are convinced beyond a reasonable doubt that there is no reasonable possibility the admission of V.B.'s statements to the SANE affected the jury's verdict regarding aggravated kidnapping and rape.

We cannot reach the same conclusion with regard to the two counts of aggravated criminal sodomy, however. The State in one of these counts alleged Bennington engaged in oral copulation or oral contact of the male genitalia with V.B. and in the other count alleged anal copulation. K.S.A. 21-3501(2) defines "sodomy" to mean "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal."

Without V.B.'s statements to the SANE, there was not clear evidence of any conduct that would meet this definition. As quoted above, V.B.'s niece testified that V.B. said the man "turned her over and tried to insert his penis in her rectum, and he also tried to put it in her mouth or did." The prosecutor followed with some additional questions:

"Q: And you said that he tried to put it in her mouth. What did you understand from that?
"A: Putting his penis in her mouth.
. . . .
"Q: My question is, do you remember whether she said he did put it in or he just tried to put it in?
"A: I'm not absolutely—I think she—she said he tried to put it in my mouth."

Arguably, one could infer oral contact with the male genitalia from the niece's testimony that V.B. said the man tried to put his penis in V.B.'s mouth. But the evidence is not clear and direct.

Similarly, without V.B.'s statements to the SANE describing anal penetration, there is no direct evidence substantiating anything more than an attempted anal sodomy. Granted, the niece's report of anal contact was substantiated by physical evidence—the SANE's observations of tears and bruising around the anal opening. In fact, the SANE testified, "I've noted the whole entire area is swollen." But this description was phrased in terms of the "opening," and while it vaguely suggests penetration, it does not clearly establish anal penetration. We cannot say beyond a reasonable doubt that the jury would have convicted Bennington of the two counts of aggravated criminal sodomy without the SANE's testimony regarding V.B.'s statements of the attack.

Consequently, we declare the admission of V.B.'s testimonial hearsay statements to the law enforcement officer and the SANE harmless with regard to Bennington's convictions of aggravated burglary, aggravated robbery, two counts of fraudulent use of a financial card, aggravated kidnapping, and rape, but we find reversible error as to the two aggravated criminal sodomy convictions. We, therefore, reverse Bennington's convictions on the two aggravated criminal sodomy counts and vacate those sentences.

## PROSECUTORIAL MISCONDUCT

Next, Bennington argues his trial was prejudiced by prosecutorial misconduct. Specifically, he contends the State violated the trial court's ruling on Bennington's motion in limine, which prohibited the mention of Bennington's "prior criminal record." He also contends that, during closing argument, the prosecutor committed misconduct by making comments that improperly voiced the prosecutor's opinion of Bennington's guilt and improperly appealed to the jury's sympathy for the victim. The Court of Appeals found no merit to Bennington's contentions, and we agree with that holding. See *Bennington*, 2009 WL 981683, at *7-10.

### Order in Limine—Preservation of Issue

Before trial, Bennington filed a motion in limine in which he sought to prohibit, *inter alia*, any reference to his past criminal conduct, including whether he "has ever been arrested for a crime,

spent any time in a prison or jail, or has ever been on probation or parole." Bennington challenges testimony which referenced his being in custody in Yakima, Washington, when law enforcement from Kansas contacted him. He focuses on the direct examination of Detective Scott Wiswell who testified that after DNA evidence obtained from V.B.'s bed sheet connected Bennington to the crimes, the detective obtained an arrest warrant for Bennington in the state of Washington. The warrant was executed. Based on that warrant, Bennington was arrested and confined at the Yakima police station, where Detective Wiswell was able to interview Bennington. The detective testified that Bennington was in custody during the interview. Bennington contends that the prosecutor violated the order in limine by eliciting testimony about his being in custody.

Bennington acknowledges he failed to object at trial to any of the detective's testimony or the prosecutor's questions. Under K.S.A. 60-404, we have established that "a contemporaneous objection must be made to all evidentiary claims—including those alleging prosecutorial misconduct—to preserve the issue for appellate review." *State v. Shadden,* 290 Kan. 803, 835, 235 P.3d 436 (2010); see *State v. King,* 288 Kan. 333, 349, 204 P.3d 585 (2009) (noting that K.S.A. 60-404 "dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial"); *cf. State v. Inkelaar,* 293 Kan. 414, 429, 264 P.3d 81 (2011), (prosecutorial misconduct argument preserved by evidentiary objection that prosecutor's questions lacked legal or factual basis). Therefore, the issue alleging prosecutorial misconduct involving the improper elicitation of testimony is not properly before this court.

Furthermore, the Court of Appeals correctly determined the prosecutor did not improperly elicit the detective's testimony because Bennington's confinement was based on the arrest warrant for the *current* crime, rather than any prior offense. See *Bennington,* 2009 WL 981683, at *8.

*Closing Argument*

Bennington raises two contentions regarding the prosecutor's closing argument: (1) The prosecutor improperly injected his personal opinion into the closing argument, and (2) the prosecutor improperly appealed to the jury's sympathy for the victim.

Bennington did not object to the challenged remarks during the State's closing argument, but a contemporaneous objection is not required to preserve a prosecutorial misconduct claim based on remarks made during voir dire, opening statements, or closing arguments, which are not evidence. See *State v. Stone*, 291 Kan. 13, 17, 237 P.3d 1229 (2010); *King*, 288 Kan. at 349.

*Standard of Review*

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury during closing argument requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Huerta-Alvarez*, 291 Kan. 247, 261, 243 P.3d 326 (2010); *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

*First Remark*

Bennington's first objection is to the following remark during the prosecutor's main portion of his closing argument: "I want to stand here right now and ask you, don't find him guilty of attempted rape. Find him guilty of rape. That's what he did." Bennington contends the prosecutor improperly voiced his personal opinion regarding Bennington's guilt. See *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006) ("Prosecutors must not state a personal opinion regarding the ultimate guilt or innocence of the defendant.").

Viewed in isolation, "That's what he did," sounds like a personal opinion. But when placed in context, this statement is not outside the wide latitude allowed attorneys during argument. The state-

ment was made during the prosecutor's explanation of the elements of attempted rape. The prosecutor stated:

"[Instruction] 11 is attempted rape. It's the lesser included offense of rape. Bottom line is, when [V.B.] tells [her niece] he tried, this is kind of, frankly, a fall back. If you're not convinced that there was actual penetration, if you're not maybe sure what all that business about injury to the interior part of [V.B.'s] genitals means, if you're not—if you don't know, just not sure what to think of all that, then at the very least he [Bennington] was trying. Clearly there was penetration, no question of that. But if all else fails, there's an attempted rape here, at least based on what [V.B.] told [her niece].

"*I want to stand here right now and ask you, don't find him guilty of attempted rape. Find him guilty of rape. That's what he did.*" (Emphasis added.)

Before making this remark, the prosecutor had also gone through the elements of rape and discussed the requirement of "penetration, however slight." A review of the entire statement shows that the prosecutor was accurately describing the evidence and relating it to the elements of attempted rape versus rape, and the statement, "That's what he did," was relating the facts to those elements. A prosecutor has wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence. *Stone*, 291 Kan. at 19; See *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 755 (2008). Bennington's argument fails on the first step of the prosecutorial misconduct analysis—the prosecutor's remark did not exceed the wide latitude afforded to the prosecution to argue inferences from the evidence presented.

*Second Remark*

Bennington next argues the prosecutor improperly injected his personal opinion about Bennington's guilt a second time by making the following remark during the main portion of his closing argument:

"I know I've kind of blown through this pretty quick, but you know what am I going to say, folks. At the end of the day we have—we live in a world today where we have the benefit of technology, DNA here tells us what [V.B.] could not tell her nurse, what she could not tell her niece *that the man who did this to her sitting right here, Mr. Bennington* that it's his DNA on that bed sheet." (Emphasis added.)

The State argues this remark was not a personal opinion offered by the prosecutor but was a statement meant to communicate to the jury that the DNA evidence proved Bennington was the person who committed the offenses. We agree. Again, during closing argument, the prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence. See *King*, 288 Kan. at 351. The evidence presented at trial supported the prosecutor's remark that the DNA linked Bennington to the crime scene. *Cf. State v. Stano*, 284 Kan. 126, 153, 159 P.3d 931 (2007) (prosecutor's closing-argument comment that there was 10 times as much of defendant's DNA on baseball cap found near crime scene than there was of anyone else's DNA was a fair construction of evidence at trial).

The remark was not outside the wide latitude allowed to the prosecutor in discussing the evidence.

### Third Set of Remarks

Bennington's final argument involves the following remarks made during the rebuttal portion of the prosecutor's closing argument: "The victim's not here to show, to tell you her side of the story, and so we have to rely on hearsay"; and "Use your common sense, please, and remember what the DNA is doing for us here. *It's speaking for* [V.B.]. It's telling us who committed these crimes." Bennington argues these comments improperly appealed to the jury's sympathy for the deceased victim.

" 'Prosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.' [Citations omitted.]" *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010); see *State v. Henry*, 273 Kan. 608, 621, 44 P.3d 466 (2002) (prosecutor's comment urging jury to think about Mother's Day, how victim's mother felt inflamed passion, prejudice of jury); but see *State v. Cravatt*, 267 Kan. 314, 336, 979 P.2d 679 (1999) (prosecutor's comment that jury should not let defendant get away with killing 21-year-old victim not improper; State asking "jury to seriously consider the nature of the defendant's act toward the victim"). Here, the Court of Appeals found the prosecutor's

remarks were not an attempt to create sympathy but were an attempt to support the State's case, despite its inability to present testimony from the victim. *Bennington*, 2009 WL 981683, at *9. We reach the same conclusion.

Further, the Court of Appeals correctly concluded the prosecutor's remarks were acceptable rebuttal to defense counsel's attack on the State's evidence. *Bennington*, 2009 WL 981683, at *9; *cf. State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007) (in determining if remarks are within latitude allowed in closing argument, appellate court may consider whether "questionable remarks made by a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel"). In defense counsel's closing argument, he directly attacked the State's case on the basis of the "second-hand" information upon which it relied. For example, defense counsel made the following remark:

"Ladies and gentlemen, I would just simply submit to you that this case is not as easy as what the State wants you to make it out to be. The fact that [V.B.] is no longer with us certainly makes the case a lot more difficult. You don't get to hear from her. You don't get to see her demeanor as she testifies. You don't get to see how she holds up under cross-examination. You're expected just to take the word of other people that have talked to her and then find this man guilty."

In response, the prosecutor reminded the jury the DNA "spoke," even though the victim could not, and linked Bennington to the scene. It was appropriate for the prosecutor to urge the jury to consider the physical evidence, even if the jury were to "ignore" the hearsay evidence. Further, as the State argues in its appellate brief, the prosecutor's DNA remark could also have referred to the fact the DNA evidence could identify the perpetrator even though V.B. was not available to do so.

In summary, the three remarks during closing argument were not improper and were within the wide latitude allowed during argument. Hence, we need not address the second step of the prosecutorial misconduct analysis. The Court of Appeals correctly concluded there was no prosecutorial misconduct during Bennington's trial. *Bennington*, 2009 WL 981683, at *10.

## IVORY ISSUE

In Bennington's final argument on appeal, he argues the use of his prior convictions in his criminal history score to enhance his sentences without requiring the history to be included in the complaint and proved to a jury beyond a reasonable doubt violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Bennington acknowledges that this court has previously rejected this argument. See, *e.g., State v. Riojas*, 288 Kan. 379, 388, 204 P.3d 578 (2009); *State v. Fewell*, 286 Kan. 370, 394-96, 184 P.3d 903 (2008); *State v. Storey*, 286 Kan. 7, Syl. ¶ 4, 179 P.3d 1137 (2008); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). This court continues to hold that the use of prior convictions for sentencing enhancement is constitutional; thus, the Court of Appeals correctly found no merit to Bennington's contention. *Bennington*, 2009 WL 981683, at *10.

Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, reversed in part, and remanded.