NOT DESIGNATED FOR PUBLICATION

No. 113,987

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ARLANDA LEE MCDUFFIE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Finney District Court; ROBERT J. FREDERICK, judge. Opinion filed June 16, 2017. Affirmed.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Tamara S. Hicks*, assistant county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN, J., and BURGESS, S.J.

*Per Curiam*: Arlanda McDuffie was convicted of committing one count of aggravated battery and four counts of child abuse against his ex-fiancé's 23-month-old son. McDuffie now appeals his convictions and sentences, raising the following arguments: (1) that the trial court erred by instructing the jury against jury nullification; (2) that his convictions must be reversed because the State committed prosecutorial error during closing arguments; (3) that there was insufficient evidence to support his conviction for one of his child abuse convictions; (4) that the trial court erred in calculating the Child Advocacy Center Fund (CACF) fees he must pay; and (5) that the

1

trial court erred by using his criminal history to lengthen his sentences without first proving his criminal history to a jury. None of McDuffie's arguments are persuasive. Accordingly, this court affirms McDuffie's convictions and sentences.

On April 30, 2014, a little after 6 p.m., McDuffie and his then-fiancé, Kaila Pollman, brought Pollman's 23-month-old son, E.J.A., to the local hospital in Garden City, Kansas. McDuffie, who had been watching E.J.A. all day while Pollman worked, explained to the doctors that E.J.A. had been suffering from seizures for well over an hour. In addition to the seizures, tests revealed that E.J.A. was suffering from bleeding in his brain and bleeding in his eyes. Moreover, a physical examination established that E.J.A. had bruising all over his body and was in a coma. After an emergency transfer to a hospital in Wichita, Kansas, E.J.A. survived his injuries. Because E.J.A.'s doctors determined that E.J.A.'s injuries were nonaccidental, his doctors contacted the police.

During the police investigation, McDuffie asserted that he fell on top of E.J.A., which caused the bruising. McDuffie then asserted that because E.J.A. would not stop crying, he shook E.J.A. and tossed him onto the couch. McDuffie told police that after he tossed E.J.A. onto the couch, E.J.A. began having seizures, which he decided to film so Pollman would not accuse him of harming E.J.A. This film was 51 minutes long. McDuffie also told police that he did not call for an ambulance because he was afraid the police would accuse him of abusing E.J.A. E.J.A. was brought to the hospital only after Pollman came home from work and realized there was something seriously wrong with E.J.A.

On May 15, 2014, the State charged McDuffie with the following: one count of aggravated battery, a severity level 4 person felony in violation of K.S.A. 2013 Supp. 21-5413(b)(1)(A); four counts of abuse of a child, each severity level 5 person felonies in violation of K.S.A. 2013 Supp. 21-5602(a)(1); and one count of aggravated endangerment of a child, a severity level 9 person felony in violation of K.S.A. 2013

2

Supp. 21-5601(b)(1). Each charge against McDuffie stemmed from alleged actions he took against E.J.A., with the four counts of child abuse stemming from alleged actions where McDuffie bruised E.J.A. before the April 30, 2014, incident. Later, the State amended the complaint to charge McDuffie with attempted first-degree murder, a severity level 1 person felony in violation of K.S.A. 2013 Supp. 21-5301 and K.S.A. 2013 Supp. 21-5402(a)(1) as an alternative to his charge of aggravated battery.

McDuffie's jury trial was held between March 9, 2015, and March 18, 2015. At the jury trial, the State presented the testimony of Pollman and E.J.A.'s former babysitter, as well as many doctors and police officers.

Pollman testified about three bruises she found on E.J.A.'s body before the April 30, 2014, incident. Pollman first explained that she had previously been unhappy with McDuffie for physically disciplining E.J.A., explaining that one time after McDuffie started watching E.J.A. she found bruises on E.J.A.'s leg and buttocks. She described those bruises as about the size of a fist. Pollman testified that she had confronted McDuffie, and he told her that he had spanked E.J.A. with a wooden spoon. Pollman testified that those bruises had healed before the April 30, 2014, injuries.

Next, Pollman testified about a bruise she had found on E.J.A.'s cheek. She testified that when she got home from work, E.J.A. appeared to have a bite mark on his face. She testified that she confronted McDuffie about the bruise on E.J.A.'s face, and McDuffie told her that his 2-year-old daughter had bitten E.J.A. Pollman explained later, however, that McDuffie admitted that he had bitten E.J.A. on the face. Pollman testified that this bruise had healed before the April 30, 2014, injuries.

Then, Pollman testified about a bruise she found on E.J.A.'s cheek about a week before the April 30, 2014, incident. Pollman testified that McDuffie had taken E.J.A. to the zoo, and when they got back, E.J.A had a bruise on his cheek. Pollman stated that

3

McDuffie had told her that E.J.A had fallen while playing at the zoo. Pollman provided conflicting testimony about whether this bruise was still visible on April 30, 2014. During Detective Freddie Strawder's testimony, Strawder testified that during his interview with Pollman, which occurred shortly after E.J.A. was brought to the hospital, Pollman had told him that the bruising on E.J.A.'s face was still visible.

Regarding the events of April 30, 2014, Pollman testified that E.J.A. used to go to a babysitter during the day while she worked full-time at J.C. Penney. But when McDuffie quit his job in March 2014, McDuffie began watching E.J.A. during the day. Pollman explained that because she and McDuffie shared a car, on the morning of April 30, 2014, McDuffie drove her to work. When she took a late lunch around 2 p.m., she called McDuffie to come pick her up. Pollman testified that during lunch, E.J.A was happy and acting fine. Pollman explained that before she returned to work at about 2:30 p.m., she laid E.J.A. down for his afternoon nap. Pollman returned to work in their car.

Pollman testified that from the time she left the house after lunch to when her shift ended at 5 p.m., she did not hear from McDuffie. Pollman testified that McDuffie knew that she did not have access to her cell phone while at work because a J.C. Penney policy required personal cell phones be kept in a locker. Pollman further testified that McDuffie knew he had to call the J.C. Penney store phone if he needed to contact her at work, but he never called the store phone that afternoon. Pollman testified that when she went to her locker at about 4:55 p.m., she saw that she had a missed call from McDuffie. Her cell phone indicated that McDuffie made the call at 4:30 p.m. Pollman testified that McDuffie had left a voicemail, in which he stated that something was wrong with E.J.A. and that they probably needed to take E.J.A. to the emergency room. Pollman stated that she immediately called McDuffie back, but he did not answer the phone.

Pollman explained that when she got home from work, she found E.J.A. lying on the living room couch unresponsive. She testified that she told McDuffie they needed to

4

get E.J.A. to the hospital three or four times before he took any action to help her get E.J.A. into their car. She testified that McDuffie attempted to show her the video he had made on his cell phone of E.J.A. having a seizure. Pollman testified that she only saw a split second of the video, though, because she was far more concerned with getting E.J.A. to the hospital.

E.J.A.'s former babysitter, Katherine Hernandez, testified that she had babysat E.J.A. between March 13, 2014, and March 28, 2014. Hernandez testified that on either March 17 or March 24, E.J.A. came to daycare with a bruise on his cheek. Hernandez testified that she asked Pollman what had happened, and Pollman responded that McDuffie's daughter had bitten E.J.A. Hernandez described the bruise as perfectly round. She also testified that she did not see any teeth marks on E.J.A.'s face.

In total, eight doctors and one registered nurse testified about E.J.A.'s injuries on behalf of the State. E.J.A.'s primary care doctor, Dr. Jeremy Roderick, testified that E.J.A. was a healthy child before the April 30, 2014, incident. Dr. Roderick testified that from the examinations and tests he conducted, he had no concerns that E.J.A. was prone to seizures, no concerns about E.J.A. having a blood disorder, and no concerns about E.J.A. bruising easily. Dr. Roderick explained that since his April 30, 2014, injuries, E.J.A. has "some developmental deficits," specifically visual impairments.

Dr. Harold Perkins, the doctor working the emergency room in Garden City when E.J.A. was brought in, testified that E.J.A. was in a coma when he arrived. Dr. Perkins explained that a computed axial tomographyscan (CAT) scan revealed a subdural hematoma, which indicated bleeding in the brain, and an eye exam revealed retinal hematoma, which indicated bleeding inside the eyes. Dr. Perkins described the bruising on E.J.A.'s body, including bruising under both eyes, on the forehead, on the ear, on his chest, and on his thighs. Dr. Perkins testified that based on the coloration of the bruises on E.J.A.'s face, he believed those bruises had occurred earlier than the others. Dr.

5

Perkins explained that he ran preliminary lab tests, which showed the E.J.A. had no blood disorder that would have caused his injuries. Dr. Perkins testified that within 45 minutes of E.J.A. arriving at the hospital, he made the decision to order an emergency life-flight transfer to a hospital in Wichita based on the severity of E.J.A.'s injuries. Dr. Perkins also testified that he contacted police because he immediately suspected that E.J.A. was the victim of child abuse.

R.N. Brittany Barrett, who is a forensic nurse in Wichita, testified about making a "body diagram" of all of E.J.A.'s injuries. R.N. Barrett testified that E.J.A. had bruises in the following locations: the top of his head, his forehead, his cheeks, his right ear, his upper chest, his lower chest, his right shoulder, his right armpit, his right wrist, his right thigh, and his left back. R.N. Barrett's body diagram and photographs of E.J.A.'s injuries were admitted into evidence.

Dr. Janet Heflin, the pediatrician who treated E.J.A. at the hospital in Wichita, said that the bruising on E.J.A.'s right armpit and chest matched the markings of adult fingers. Dr. Heflin testified that the bruising on E.J.A.'s right thigh matched the markings of an adult grabbing E.J.A. by the leg. Dr. Heflin testified about blood testing she performed, which showed that E.J.A. had better than normal blood clotting abilities, which meant that E.J.A. was actually less prone to bruising than the average person.

Dr. Paul Weishaar, the ophthalmologist who treated E.J.A. at the hospital in Wichita, testified that his eye examination of E.J.A. revealed extensive hemorrhaging throughout E.J.A.'s retina in both eyes. Dr. Weishaar testified that E.J.A.'s injuries to his eyes were consistent with abusive head trauma, also known as shaken baby syndrome. Dr. Weishaar explained that given E.J.A.'s injuries, there was no other plausible explanation for what happened. Dr. Weishaar explained that the injuries had caused permanent damage to E.J.A.'s eyes, which could result in poor vision or blindness.

6

Dr. William Waswick, Dr. Lindall Smith, and Dr. John Dickerson, all of whom treated E.J.A. while in Wichita, also testified that E.J.A.'s injuries were not accidental but were the result of abuse. Dr. Waswick and Dr. Smith testified that typical toddler bruising occurs on the knees and forearms, which are the places where people typically catch themselves when falling. Dr. Smith testified that a person could not get the injuries that E.J.A. sustained without "repetitive jarring" of the head. Dr. Smith explained the two instances doctors typically see in patients with injuries like E.J.A.'s injuries are when a person is involved in a roll-over car accident while not wearing a seat belt or when a person has sustained a "shaking injury." Dr. Smith further testified that a fall could not account for E.J.A.'s injuries, unless he fell out of a second-story window, hit a roof, and then hit the ground. Moreover, Dr. Smith testified that his analysis of E.J.A.'s CAT scan showed that there were both old and new bleeding in E.J.A.'s brain, meaning E.J.A. had suffered some serious trauma to his head before this latest incident.

Dr. Bassem El-Naboutt, who is E.J.A.'s pediatric neurologist, explained that E.J.A. has to take seizure medications now. Dr. Naboutt testified that E.J.A.'s most recent December 2014 electroencephalogram (EEG) test was highly abnormal with significant epileptic activity. Dr. Naboutt additionally testified that the injuries E.J.A. sustained were consistent with child abuse and could not have been caused by an adult falling on top of a child.

Detective Strawder, Patrol Officer Tanya Bradley, and Captain Michael Utz were the primary people from the Garden City Police Department involved in E.J.A.'s case. Detective Strawder testified that when he arrived at the hospital in Garden City, he was given McDuffie's phone. Detective Strawder explained that McDuffie had voluntarily offered another officer his cell phone, telling that officer that there was a video of E.J.A. suffering from seizures on it. Although not included in the record on appeal, the video that McDuffie took of E.J.A. having seizures was admitted into evidence and played before the jury without objection. The video was 51 minutes long and shows E.J.A. lying

7

on the living room couch suffering seizures, with saliva running down his face while McDuffie periodically checks on E.J.A.

Detective Strawder testified about the different sounds on the video, including videogame noises. Detective Strawder explained that during the video, one cannot see a videogame being played, but one can hear an NBA basketball videogame being played in the background. Detective Strawder explained that McDuffie appears in the video a total of six times to check on E.J.A. Detective Strawder explained that each time that McDuffie appeared on-screen, there were no videogame noises in the background; yet, each time McDuffie went off-screen, the videogame noises started again within a few seconds. Detective Strawder explained that he was sure that somebody was playing the videogame because one can hear different NBA players, like Tony Parker, Tim Duncan, and Manu Ginobili, scoring. Moreover, Detective Strawder explained that the score kept increasing as the video continued. Detective Strawder testified that when he and other police officers arrived to search Pollman's apartment on May 1, 2014, McDuffie had the videogame NBA 2K14 on pause. Detective Strawder testified that the police left the videogame on pause, and the videogame stayed on pause throughout their 2-hour search of the apartment.

Officer Bradley testified about McDuffie's voluntary interview with her at the police station. The interview started at 9:03 p.m. on April 30, 2014. Officer Bradley testified that McDuffie kept changing the time when E.J.A. started having seizures. Officer Bradley testified that at first, McDuffie said nothing had happened, then he said that E.J.A had fallen once, then he said E.J.A. had fallen twice, and then he said he had fallen on top of E.J.A. in the kitchen. Officer Bradley testified that she asked McDuffie why he filmed E.J.A. having the seizures, and he told her that he wanted Pollman to know what had happened. Officer Bradley testified that McDuffie told her that he had bitten E.J.A. on the cheek once because E.J.A. had bitten him.

8

Both Detective Strawder and Captain Utz testified about their interactions with McDuffie when he arrived at his shared apartment with Pollman in the early morning hours of May 1, 2014. Evidently, after his interview, McDuffie told police that he would stay at his sister's apartment. Yet, when McDuffie arrived at his sister's apartment, she was not there. As a result, he walked over to his shared apartment with Pollman. Meanwhile, Pollman had given police permission to search the apartment. Thus, the police were at the apartment when McDuffie arrived. Detective Strawder and Captain Utz testified that once McDuffie was inside the apartment, they questioned McDuffie about falling on top of E.J.A. in the kitchen, asking him to reenact what had happened. Both testified that McDuffie stated he was at the refrigerator with the door open when he turned around and accidentally fell on top of E.J.A. Captain Utz testified that he told McDuffie that a fall was not consistent with E.J.A.'s injuries, at which point McDuffie admitted that he had shaken E.J.A. because he was crying.

Captain Utz testified that he then asked McDuffie to take one of E.J.A.'s teddy bears and reenact how he had shaken E.J.A. Both Detective Strawder and Captain Utz testified that McDuffie demonstrated how he had shaken E.J.A. twice, asking McDuffie to demonstrate how he shook E.J.A. a second time so they could film it. Both testified that the first time McDuffie demonstrated how he shook E.J.A., it was far more aggressive than the second time he demonstrated how he had shaken E.J.A. Both also testified that in the first demonstration he dropped the teddy bear onto the couch, as opposed to the second demonstration where he placed the teddy bear on the couch. Although not included in the record on appeal, the video of the second demonstration was admitted into evidence and played before the jury. Captain Utz additionally testified that McDuffie told him that he shook E.J.A. for about a "couple minutes."

After the State rested, it moved to dismiss the single count of aggravated endangerment of a child against McDuffie. The trial court granted the State's motion. Accordingly, the remaining charges against McDuffie was the single count of attempted

9

first-degree murder, or in the alternative, aggravated battery, and four separate counts of child abuse.

The primary evidence in McDuffie's case was his testimony and Doctor Thomas Young's testimony. McDuffie testified that he fell on top of E.J.A. in the kitchen when he turned around while getting a drink out of the refrigerator. McDuffie testified that after he fell on top of E.J.A., E.J.A. tried to get up twice, but both times fell down, hitting the back of his head. McDuffie testified that he then placed E.J.A. on the couch. McDuffie testified that although he told the police he shook E.J.A., he did not actually shake E.J.A. McDuffie testified that he felt pressure from the police to say that he shook E.J.A. McDuffie asserted that after he put E.J.A. on the couch, he started playing a videogame but soon noticed that something was wrong with E.J.A. McDuffie testified that he decided to film E.J.A. having seizures because "[he] wanted to be able to explain to [Pollman] what was going on with [EJA]." McDuffie also testified that the police actually filmed him in the first demonstration with the teddy bear, but the police got rid of that film because he had fainted from exhaustion during the middle of filming.

Regarding prior injuries he allegedly inflicted on E.J.A., McDuffie testified that he and E.J.A. went to the zoo a few times. McDuffie testified that one time he gave E.J.A. a "hickey" after E.J.A. bit his finger and that he "was just having innocent fun" with E.J.A. McDuffie denied biting E.J.A. McDuffie testified that another time at the zoo, E.J.A. fell at the zoo and hurt himself; he testified that this happened about a week before April 30, 2014. Regarding the incident with the wooden spoon, McDuffie asserted that he had merely tapped E.J.A. on the thigh with a very small wooden spoon. McDuffie also testified that about 3 days before April 30, 2014, he spanked E.J.A. McDuffie said that he used his hand to "tap" E.J.A.'s thigh when E.J.A. had placed his hand in his mouth.

On cross-examination, McDuffie denied playing a videogame while E.J.A. was having seizures. McDuffie testified that one of his videogame controllers would

10

malfunction sometimes, and the malfunctioning caused it to "unpause" the game he was playing. McDuffie testified that the controller was malfunctioning and unpausing his game during his film of E.J.A.'s seizures, which is why one can hear the videogame noises in the video. McDuffie admitted that when he decided to check on E.J.A. while filming his seizures, he often looked into the camera and started talking. McDuffie admitted he made the following statements to the camera while filming E.J.A.'s seizure: "[T]his is freaking the fuck out of me, man?"; "I don't like that, stop it"; "[Y]ou can't breathe, like something is up"; "[W]e need to get you to a hospital as soon as we can." McDuffie also testified that he did not call an ambulance because Pollman came home immediately after he called her. When confronted with the fact that E.J.A. had been having seizures for nearly an hour before Pollman arrived home, McDuffie responded that he did not know why he did not call an ambulance.

Dr. Young, who is a forensic pathologist, testified that E.J.A.'s seizure could have caused the bleeding in his brain, bleeding in his eyes, and the bruising all over his body. Dr. Young testified that from his review of E.J.A.'s CAT scan, he did not believe that shaking could have caused E.J.A.'s injuries but that an adult falling on top of E.J.A. could have caused those injuries.

During closing arguments, the State elected the particular criminal act it wanted the jury to consider for each of the charges against McDuffie. For count one—attempted murder or in the alternative aggravated battery, the State elected to rely upon the alleged shaking incident that occurred on April 30, 2014. For count two—the first abuse of a child charge, the State elected to rely upon the alleged incident where McDuffie bit E.J.A.'s face. As to the remaining counts of abuse of a child, for count three the State elected to rely upon the alleged spanking incident with the wooden spoon, for count four the State elected to rely upon the alleged incident where E.J.A. came back from the zoo with bruises on his cheeks a few days before April 30, 2014, and for count five the State elected to rely upon the alleged incident where McDuffie "tapped" E.J.A. on the thigh a

11

few days before April 30, 2014. For counts four and five, the State argued that McDuffie was lying about what had happened, asserting that McDuffie had actually intentionally hurt E.J.A., which was why there were bruises on his cheeks and his thigh when he was admitted into the hospital.

After a day of deliberations, the jury found McDuffie guilty of the alternative aggravated battery count and on all four counts of child abuse. Before trial, the State had moved for an upward durational departure should McDuffie be convicted based on the aggravating factors of excessive brutality, victim vulnerability, and fiduciary relationship. Following the jury's verdicts, the trial court granted the State's request to present arguments concerning the aggravating factors to the jury. Accordingly, both the State and McDuffie presented arguments to the jury concerning the aggravating factors. The jury ultimately found that all three aggravating factors existed.

With the upward durational departure, the trial court sentenced McDuffie to a total of 368 months' imprisonment followed by 36 months' postrelease supervision, running all five of McDuffie's sentences consecutively. Under the double rule, McDuffie's controlling term was 192 months' imprisonment. The trial court also ordered that McDuffie pay a $400 fee to the Child Advocacy Center Fund (CACF) for each of his five convictions because the victim of each conviction was a minor.

*Did the Trial Court Err in Instructing the Jury?*

McDuffie argues that the trial court erred when it gave Jury Instruction No. 2, which outlined the test the jury was required to consider when determining whether McDuffie was guilty. Specifically, McDuffie argues that the trial court instructed the jury against jury nullification because Instruction No. 2 stated that the jury "should" find him guilty if it had no reasonable doubt about "the truth of each of the claims required to be proved by the State." Citing *State v. Smith-Parker*, 301 Kan. 132, Syl. ¶ 6, 340 P.3d 485

12

(2014), and *State v. Lovelace*, 227 Kan. 348, 354, 607 P.2d 49 (1980), *overruled in part by Smith-Parker*, 301 Kan. 132, McDuffie argues that the word "should" is akin to directing a verdict for the State and instructing against nullification. The State provides very little argument on this issue, merely stating that Instruction No. 2 complied with the Pattern Instructions Kansas (PIK) Crim. 4th 51.010 and no prejudice exits.

*Standard of Review*

Appellate courts must comply with the following four steps when reviewing jury instruction challenges:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

*Preservation*

McDuffie concedes that he did not object to the wording of Instruction No. 2 below. K.S.A. 2016 Supp. 22-3414(3) states that absent an objection below, appellate courts will not reverse unless the instruction error was clearly erroneous. As a result, appellate courts consider instruction challenges raised for the first time on appeal, but the clearly erroneous test applies. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012). Our Supreme Court has explained that an instruction is "clearly erroneous only if the

13

reviewing court is firmly convinced that the jury would have reached a different verdict had the error not occurred." *State v. Tully*, 293 Kan. 176, 196, 262 P.3d 314 (2011). Appellate courts have unlimited review when considering whether the instruction was clearly erroneous. *Williams*, 295 Kan. at 515-16.

As a result, if we would determine that Instruction No. 2 was erroneous, we would then consider whether reversal was required under the clearly erroneous test. Yet, without any argument or further explanation, after recognizing that the clearly erroneous test applies to instruction challenges raised for the first time on appeal, McDuffie contends that the constitutional harmless error test should apply in his case because his constitutional rights have been implicated. McDuffie's failure to provide any authority or explanation about why the constitutional harmless error test applies, however, means that he has failed to adequately brief his argument. See *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015) (holding that failure to support an argument with pertinent authority or explain why it is sound despite the lack of pertinent authority results in the failure to brief an issue, and failure to brief an issue amounts to abandonment). In turn, this means that McDuffie has abandoned his argument on appeal. Moreover, even if McDuffie had not abandoned his argument, in *Williams*, 295 Kan. at 517, our Supreme Court explained that so long as a jury instruction challenge is being raised for the first time on appeal, a defendant's characterization of a jury instruction challenge as a constitutional claim does not result in the application of the constitutional harmless error test.

Therefore, assuming McDuffie establishes that using the word "should" in Instruction No. 2 was error, he must establish that the error was clear error to be entitled to reversal of his convictions.

14

*Instruction No. 2 was Legally Appropriate*

Jury nullification occurs when a jury refuses to return a verdict because the jury has knowingly and deliberately rejected the evidence and refused to apply the law. *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008). A defendant does not have the right to instruct the jury on the power of jury nullification. *State v. Naputi*, 293 Kan. 55, 65-66, 260 P.3d 86 (2011). On the other hand, the trial court cannot instruct the jury in a way that prohibits the jury from nullifying a verdict. *Smith-Parker*, 301 Kan. 132, Syl. ¶ 6.

Instruction No. 2 is a direct quote from PIK Crim. 4th 51.010—"Burden of Proof, Presumption of Innocence, Reasonable Doubt." In full, Instruction No. 2 states:

> "The test you must use in determining whether the defendant is guilty or not is guilty is this: If you have reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find the defendant guilty." (Emphasis added.)

Although Instruction No. 2 directly quotes PIK Crim. 4th 51.010, McDuffie argues that using the word "should" in the instruction commanded the jury to return a guilty verdict, meaning the jury was instructed against jury nullification.

McDuffie's argument hinges on his understanding of the *Smith-Parker* court's interpretation of *Lovelace*. As noted in his brief, in *Lovelace*, our Supreme Court examined a reasonable doubt jury instruction that stated the jury "must" find the defendant guilty as charged if the jury had no doubt about any of the State's claims. *Lovelace*, 277 Kan. at 354. Lovelace argued that the jury instruction was erroneous because it mandated a verdict and that the trial court should have told the jury that it "should" convict him if it had no doubts about the State's claims. Our Supreme Court

15

disagreed, holding that the words "must" and "should" in a reasonable doubt jury instruction were interchangeable because both words "convey[ed] a sense of duty and obligation." *Lovelace*, 277 Kan. at 354.

In *Smith-Parker*, however, our Supreme Court overruled part of its holding in *Lovelace*, determining that the word "must" in a reasonable doubt jury instruction came too close to directing a verdict in the favor of the State. 301 Kan. at 164. The instruction at issue in *Smith-Parker* stated, "If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you *will* enter a verdict of guilty." (Emphasis added.) 301 Kan. at 163. The *Smith-Parker* court held: "Both the wording of the instruction at issue in *Lovelace*—'must'—and the wording at issue here—'will'—fly too close to the sun of directing a verdict for the State." 301 Kan. at 164.

Based on the *Smith-Parker* court's holding overruling the *Lovelace* court's holding about the word "must," McDuffie argues that the *Smith-Parker* court also held that the word "should" in a reasonable doubt jury instruction instructs the jury against jury nullification. Nevertheless, McDuffie's argument ignores that the *Smith-Parker* court's holding was limited to the words "will" and "must." The *Smith-Parker* court never addressed the propriety of the word "should" in a reasonable doubt jury instruction. Surely, if the *Smith-Parker* court intended to hold that trial courts can no longer use the word "should" in a reasonable doubt jury instruction, the *Smith-Parker* court would have explicitly made this holding. Indeed, the *Smith-Parker* court's lack of comment on using the word "should" in a reasonable doubt jury instruction means that the *Lovelace* court's approval of the word "should" is still binding precedent.

It is a well-known rule that this court is duty bound to follow our Supreme Court's precedent unless there is some evidence that our Supreme Court is moving away from a prior holding. *State v. Singleton*, 33 Kan. App. 2d 478, 488, 104 P.3d 424 (2005).

16

Clearly, the *Smith-Parker* court's lack of comment on the use of the word "should" in a reasonable doubt jury instruction means that our Supreme Court is not moving away from its prior holding in *Lovelace*. As a result, this court is duty bound to follow our Supreme Court's precedent, meaning McDuffie's argument fails.

Furthermore, it is worth pointing out that this court rejected this same argument about extending the *Smith-Parker* court's holding on the word "must" in a reasonable doubt jury instruction to the word "should" in a reasonable doubt jury instruction in the following cases: *State v. Benewiat*, No. 114,676, 2017 WL 66355, at *7-8 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* February 6, 2017; *State v. Limburg*, No. 112,727, 2016 WL 3202546, at *7-8 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* July 7, 2016; *State v. Ford*, No. 112,877, 2016 WL 2610259, at 8-9 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. __ (February 17, 2017); *State v. Hastings*, No. 112,222, 2016 WL 852857, at *4-5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. __ (April 17, 2017); *State v. Singleton*, No. 112,997, 2016 WL 368083, at *4-6 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. __ (January 29, 2016); *State v. Jones*, No. 111,386, 2015 WL 4716235, at *5-6 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1080 (2016).

Last, as explained by this court in *Singleton*, the words "should," "must," and "will" have different meanings:

> "But as every teacher instructing a class knows, and as every parent admonishing a child knows, should is less of an imperative than must or will. [Citation omitted.] Nutritionists urge that we all should eat our vegetables. But that does not constitute a directive to have recalcitrant diners force-fed their vegetables if they do not comply. A parent admonishing a child that he should eat his lima beans is clearly less of an imperative than the phrase every child has heard at one time or another, 'You will eat your lima beans!' Should as used in this instruction is not the equivalent of 'must' or 'will' used in the instructions discussed in *Lovelace* and *Smith-Parker*. Should is advisory. It is

17

not an imperative. The district court did not err in giving this instruction." 2016 WL
368083, at *6.

Consequently, even if our Supreme Court had not already held that the word "should" in a reasonable doubt jury instruction is legally appropriate, it is readily apparent that its use is legally appropriate because the word "should" is advisory.

In summary, because Instruction No. 2 was legally appropriate, McDuffie has failed to establish that error existed. As a result, this court affirms.

*Did the Prosecutor Commit Error During Closing Arguments?*

Next, McDuffie takes issue with a statement made by the prosecutor during rebuttal to McDuffie's closing. Specifically, McDuffie takes issue with the prosecutor's statement that what happened to E.J.A. was tragic and "sad" when one considered "the amount of trauma [E.J.A.] ha[d] had to go through." McDuffie argues that this statement was outside the wide latitude afforded to prosecutors during closing arguments because it was made to inflame the passions and prejudices of the jury. Then, McDuffie argues that the prosecutor's statement was so improper that it denied him a fair trial. The State counters that the prosecutor's statement was proper because it was made in response to McDuffie's attorney's statements about what happened to E.J.A. being a tragedy.

*Standard of Review*

After McDuffie filed his brief but before the State filed its brief, our Supreme Court changed the standard for reviewing challenges about a prosecutor's conduct in *State v. Sherman*, 305 Kan. 88, 107, 378 P.3d 1060 (2016). *Sherman* overruled the former standard stated in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004).

18

Under the old standard outlined in *Tosh*, appellate courts reviewed prosecutorial misconduct under a two-step process. First, appellate courts considered if the prosecutor's statement was outside the wide latitude afforded to prosecutors during closing. *Tosh*, 278 Kan. at 85. If the prosecutor's statement fell outside of this wide latitude, then the prosecutor had committed misconduct. *Tosh*, 278 Kan. at 85. Second, once misconduct had been established, appellate courts considered whether the statement constituted plain error, which means the defendant was denied his or her right to a fair trial. *Tosh*, 278 Kan. at 85. Under this second step, appellate courts were required to determine whether the misconduct was gross or flagrant, whether the misconduct was the result of ill will, and whether the evidence was of such an overwhelming nature that the misconduct likely played no role in the minds of the jury. *Tosh*, 278 Kan. at 93. Moreover, under this final factor regarding the overwhelming nature of the evidence, appellate courts were prohibited from affirming unless the State could establish that there was no reasonable possibility the misconduct affected the verdicts of the case. *Tosh*, 278 Kan. at 96.

Alternatively, under the new standard outlined in *Sherman*, although appellate courts still use a two-step process, this process has been streamlined. Briefly, the first step remains the same as the old *Tosh* standard but the second step has been abridged, requiring appellate courts to simply consider whether the statement resulted in prejudice. The *Sherman* court explained:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error

19

complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.] We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" 305 Kan. at 109.

Of further importance, the *Sherman* court declared that judicial review of prosecutorial behavior will now be called "prosecutorial error" instead of "prosecutorial misconduct." 305 Kan. 88, Syl. ¶ 5.

Accordingly, the issue that results is what standard of review applies in this case given the timing of McDuffie's appeal? Since *Sherman* was decided, when reviewing challenges concerning prosecutorial conduct, our Supreme Court has used the old *Tosh* standard alone in *State v. Carter*, 305 Kan. 139, 148, 380 P.3d 189 (2016), and *State v. Netherland*, 305 Kan. 157, 180, 379 P.3d 1117 (2016); both the old *Tosh* standard and the new *Sherman* standard in *State v. Kleypas*, 305 Kan. 224, 315-16, 382 P.3d 373 (2016); and the new *Sherman* standard alone in *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017). Thus, our Supreme Court has been inconsistent in its application of the standard for reviewing prosecutorial conduct. Clearly, however, the safest route is to analyze McDuffie's challenge under both the old *Tosh* standard and the new *Sherman* standard. Thus, we will analyze McDuffie's challenge under both standards of review.

*The Prosecutor's Statement was Appropriate*

The sum total of McDuffie's argument is that the prosecutor's statement was made to inflame the passions and prejudices of the jury with the goal of diverting the jury's attention away from the evidence. McDuffie cites *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011), for the proposition that "a prosecutor's argument regarding the impact of a crime on a victim or a victim's family may constitute reversible error because it diverts

20

attention from the evidence and law." McDuffie argues that the prosecutor's statement was aimed at focusing the jury's attention on how E.J.A. had been affected by his injuries instead of the law and facts of his case.

Nevertheless, as the State points out in its brief, McDuffie has conveniently ignored that his attorney was the first person to refer to what happened to E.J.A. as a tragedy. During closing arguments, McDuffie's attorney argued that what happened to E.J.A. was a "tragic accident." At the very end of closing, McDuffie's attorney further stated: "[T]his is a tragic, tragic situation. First of all, it's tragic for little [E.J.A.], . . . for whatever reason . . . he had these symptoms and . . . there's some ramifications from that, but it's also a tragedy for my client because he was the one, he was the one that was there." Based on these statements, it is clear that McDuffie's theory at trial was that however tragic E.J.A.'s injuries were, he did not intentionally inflict those injuries, and what happened to E.J.A. was a tragic accident. The only time the State referred to what happened to E.J.A. as tragic was during its rebuttal to McDuffie's closing.

In the past, our Supreme Court has held that courts can consider whether a prosecutor's statement was made in rebuttal to something stated by the defense during closing. See *State v. Bennington*, 293 Kan. 503, 533, 264 P.3d 440 (2011). More recently, our Supreme Court has cautioned, however, that "'a prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel. The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court.'" *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (quoting *State v. Marshall*, 294 Kan. 850, 861, 281 P.3d 1112 (2012). Thus, the fact that the prosecutor was responding to McDuffie's attorney's statements does not automatically mean that the prosecutor did not commit misconduct under the old *Tosh* standard or error under the new *Sherman* standard. Instead, the fact that the prosecutor was responding to McDuffie's attorney's statement is just one element this court may consider in its determination.

21

Yet, this element, in conjunction with the limited nature of the prosecutor's statement, establishes that the prosecutor's statement was within the wide latitude afforded to prosecutors during closing. The full statement made by the prosecutor, which McDuffie has neglected to include in his brief, was as follows: "[McDuffie's attorney] talked about the tragedy of this and it . . . is sad when you consider all of this. And then how in his young life the amount of trauma that [E.J.A.] has had to go through." Thus, not only did the prosecutor not refer to the situation as being tragic until after McDuffie's attorney referred to E.J.A.'s situation as being tragic, when the prosecutor referred to E.J.A.'s situation as being tragic, the prosecutor explicitly noted that it was McDuffie's attorney who had originally called E.J.A.'s situation tragic. The prosecutor's statement was limited to agreeing with McDuffie's attorney that E.J.A.'s situation was tragic, without any other comment on the tragic nature of E.J.A.'s situation.

The limited scope of the prosecutor's statement is incredibly important because it leads to the following question: How can a prosecutor commit either misconduct or error by simply repeating an argument or statement made by defense counsel? The answer is that a prosecutor who simply repeats an argument or statement made by defense counsel cannot commit either misconduct or error because the prosecutor is not saying anything to the jury that had not already been said by the defense.

*Conclusion*

In conclusion, the first step of the old *Tosh* standard and the new *Sherman* standard are identical as both require this court to consider whether the prosecutor's statement fell within the wide latitude afforded prosecutors during closing arguments. *Sherman*, 305 Kan. at 109; *Tosh*, 278 Kan. at 85. McDuffie's only argument is that the prosecutor's statement about what happened to E.J.A. being a tragedy was outside the wide latitude afforded to prosecutors during closing arguments. Nevertheless, when the full statement of the prosecutor is considered in context, it is clear that the prosecutor was

22

just repeating what McDuffie's attorney said during his closing. Therefore, although McDuffie has insinuated that he is challenging a statement made by the State with the goal of inflaming and distracting the jury, in actuality, he is challenging the prosecutor's statement paraphrasing and agreeing with his attorney's earlier statement that what happened was a tragedy. Because the prosecutor merely paraphrased and agreed with McDuffie's attorney, never expanding on McDuffie's attorney statement, the prosecutor's statement could not have been misconduct or error.

*Was There Sufficient Evidence to Convict McDuffie of Child Abuse?*

To review, during closing arguments, the State elected the particular criminal act it wanted the jury to consider for each of the charges against McDuffie. For count two – the first abuse of a child charge, the State elected to rely upon the alleged incident where McDuffie bit E.J.A.'s face a month or so before the April 30, 2014, incident. On appeal, McDuffie challenges the sufficiency of the evidence for this count. McDuffie's primary argument is that there was insufficient evidence to support that he tortured E.J.A. as required under the theory of child abuse for which he was charged because the bruise was caused by a "hickey" and because E.J.A. was laughing when he received the "hickey." The State counters that there was more than enough evidence to support McDuffie's count two abuse of a child conviction.

*Standard of Review*

When defendants challenge their convictions for insufficiency of the evidence, appellate courts must consider whether the evidence supports their convictions when viewed in the light most favorable to the State. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). The defendants' convictions will be upheld if a rational factfinder could have used the evidence presented to find the defendants guilty beyond a reasonable doubt. *Laborde*, 303 Kan. at 6. While engaging in this review, appellate courts must

refrain from reweighing evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Reversal will occur in only the rarest cases where the testimony was so incredible that a rational factfinder could not have found the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

*Sufficient Evidence Supported McDuffie's Conviction*

In count two, the State charged McDuffie with child abuse under K.S.A. 2016 Supp. 21-5602(a)(1). K.S.A. 2016 Supp. 21-5602(a)(1) states that "[a]buse of a child is knowingly: (1)[T]orturing or cruelly beating any child under the age of 18 years." Although K.S.A. 2016 Supp. 21-5602(a)(1) states that abuse under this theory can occur by torturing or cruelly beating a child, the jury was instructed that it could convict McDuffie of child abuse only if McDuffie "knowingly tortured [E.J.A.]" As a result, for McDuffie's conviction to be upheld, there must be sufficient evidence to support that he tortured E.J.A. when he made the mark on his cheek. Our Supreme Court has defined "torture" in the child abuse statute as meaning "'inflict[ing] intense pain to body or mind for purposes of punishment.'" *State v. Bruce*, 255 Kan. 388, 394, 874 P.2d 1165 (1994) (quoting Black's Law Dictionary 1490 [6th ed. 1990]).

As he did at trial, McDuffie concedes that he bruised E.J.A.'s cheek. Yet, McDuffie takes issue with the assertion that he bit E.J.A., emphasizing his trial testimony where he said he merely gave E.J.A. a "hickey." McDuffie asserts that the only evidence presented at trial about E.J.A.'s reaction to receiving the hickey was that E.J.A. laughed. McDuffie states that "receiving suction from a mouth to skin, commonly known as a hickey, does not necessarily cause intense physical or mental pain." McDuffie also emphasizes Hernandez' testimony that although she saw a bruise on E.J.A.'s cheek, she did not see any bite marks on E.J.A.'s cheek. Given the preceding, McDuffie argues that no evidence established that he inflicted "intense physical pain or mental pain" as required to torture E.J.A.

24

Nevertheless, there are several problems with McDuffie's argument. For starters, assuming the bruise was the result of a hickey, McDuffie has implicitly conceded that a hickey may cause intense physical or mental pain. Again, in his brief, McDuffie asserts that a hickey "*does not necessarily* cause intense physical or mental pain." (Emphasis added.) In other words, McDuffie has argued that a hickey does not always cause intense physical or mental pain *but may sometimes cause intense physical or mental pain*. Again, all that is needed to sustain McDuffie's conviction is enough evidence for a rational factfinder to find McDuffie guilty beyond a reasonable doubt. Because McDuffie has admitted (1) that he gave E.J.A. a hickey and (2) that receiving a hickey may cause intense physical or mental pain, there was clearly a basis in evidence for the jury's guilty verdict.

Next, McDuffie has presented a highly favorable interpretation of the evidence admitted at trial. McDuffie assumes that the jury accepted his testimony that the bruise formed because he gave E.J.A. a hickey. Yet, as the State points out in its brief, McDuffie was the only person who testified that the bruise formed because he gave E.J.A. a hickey. Pollman testified that after initially telling her that his daughter had bitten E.J.A., McDuffie admitted that he had bitten E.J.A. Officer Bradley testified that during her interview with McDuffie, McDuffie told her that he bit E.J.A. on the cheek because E.J.A. had bitten him; thus, McDuffie was punishing E.J.A. According to Officer Bradley, at that point, McDuffie was calling the bruise a lip print. In fact, McDuffie never asserted that he gave E.J.A. a hickey until his trial testimony. Hence, very strong evidence supported that the bruise on E.J.A.'s cheek formed because McDuffie bit E.J.A., not because he gave E.J.A. a hickey

Likewise, McDuffie has presented a highly favorable interpretation of what the bruise on E.J.A.'s cheek looked like. In his brief, McDuffie alleges that the only evidence presented regarding what the bruise looked like came from Hernandez, who testified that the mark was a perfect circle and lacked teeth marks. Pollman, however, testified that the

bruise "looked like a bite mark." The term "bite mark" undoubtedly implies that E.J.A.'s bruise appeared as if it was formed after someone used their teeth to clinch down on his cheek. Thus, although Hernandez testified that she saw no teeth marks on E.J.A.'s cheek, Pollman testified that the bruise appeared to have been caused by someone's teeth to bite E.J.A. Given McDuffie's conviction, it seems highly likely that the jury found Pollman's description of E.J.A.'s bruise more credible than Hernandez' description. Furthermore, this credibility determination was reasonable given that Pollman was E.J.A.'s mother, meaning Pollman was likely around E.J.A. and his bruise more than Hernandez, and Pollman saw E.J.A.'s bruise before Hernandez. Moreover, this court is not in a position to reweigh credibility determinations when those determinations are founded on evidence. See *Daws*, 303 Kan. at 789.

McDuffie further fails to take into account that the credibility of his testimony was undermined by Pollman's and Officer Bradley's testimony. Once more, both Pollman and Officer Bradley testified that McDuffie had admitted to them that he bit E.J.A.'s face. Also, Pollman testified that McDuffie initially lied about the bruise, stating that his daughter had bitten E.J.A. The veracity of Pollman's testimony is confirmed by Hernandez' testimony, who testified that Pollman had told her that McDuffie's daughter had bitten E.J.A.

Next, McDuffie's argument that there was insufficient evidence to convict him because the only evidence presented about E.J.A.'s reaction to the "hickey" was that E.J.A. was laughing and having fun is also without merit. McDuffie concludes that because the only evidence presented about E.J.A.'s reaction was that he was laughing, no evidence that E.J.A. suffered the intense physical or mental pain required to be tortured existed. Nevertheless, McDuffie's argument assumes that what he said about E.J.A's reaction is the truth. As addressed already, McDuffie's credibility was undermined by his ever changing story about how E.J.A. got the bruise. More importantly, because the jury convicted McDuffie on the alternative count of aggravated battery and all four counts of

26

child abuse, it is readily apparent that the jury did not find McDuffie's testimony about E.J.A.'s bruise credible.

Furthermore, it is important to emphasize that the jury was not required to accept McDuffie's testimony simply because he was the only one who could speak to E.J.A.'s reaction. It is a well-known rule of this court that a conviction of even the gravest offense can be supported by circumstantial evidence. *State v. Thach*, 305 Kan. 72, 82, 378 P.3d 522 (2016). Our Supreme Court has defined circumstantial evidence as "'evidence that tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue, and therefore affords a basis for a reasonable inference by the jury . . . of the fact in issue.'" *Thach*, 305 Kan. at 82 (quoting *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 550, 431 P.2d 518 [1967]). Due to the unique nature of child abuse cases involving children, young children who have been allegedly abused often cannot testify about what happened to them. In such situations, the defendant may be the only person who was actually present when the alleged abuse took place who can testify. Thus, in many cases, the jury must determine whether the defendant's testimony about what happened to the child seems credible when considered in light of all the other evidence, including circumstantial evidence, presented at trial.

Here, although McDuffie testified that E.J.A. was having fun when he gave E.J.A. a "hickey," other evidence supported that it was highly unlikely that this was E.J.A.'s reaction. Again, at trial, there was evidence that E.J.A. had a bruise on his cheek that appeared to be the result of a bite mark. Moreover, both Pollman and Officer Bradley testified that McDuffie told them that he had bitten E.J.A. Common experience supports that bites cause pain. Common experience supports that a bite on the cheek could be incredibly painful because the cheek is a sensitive area. Common experience also supports that a bite on the cheek of a 23-month-old child by an adult could be very painful for the child given the child's young age and the size difference between the 23-

27

month-old and the adult. To sum up, a reasonable jury could conclude that a 23-month-old child who was bitten by an adult and who had a bruise with a bite mark would have suffered such intense physical or mental pain to support a conviction for child abuse under the theory of torture.

Last, McDuffie's argument ignores that the jury was not required to consider the bruise on E.J.A.'s cheek in isolation from the other evidence. At trial, through the testimony of Pollman, E.J.A.'s doctors, and the Garden City police officers, there was very strong evidence that McDuffie violently shook E.J.A and then dropped him on a couch. Moreover, there is no dispute that McDuffie filmed E.J.A. having a seizure for 51 minutes. Even more damning is the fact that during those 51 minutes, McDuffie played a videogame as E.J.A. suffered from a medical emergency; McDuffie's contention that his videogame controller magically paused itself each of the six times he was on-screen checking on E.J.A. and then "unpaused" itself each of the six times he went off-screen is nothing short of preposterous.

*Conclusion*

Although McDuffie has alleged that there was insufficient evidence to support that he committed child abuse under count two, there was ample evidence supporting his guilt. First, McDuffie has conceded that the "hickey" he gave E.J.A. may have caused E.J.A. intense physical or mental pain. Second, significant evidence, including McDuffie's pretrial statements, supported that McDuffie bit E.J.A. so hard that he bruised E.J.A.'s cheek because he wanted to punish E.J.A. for biting him. Third, while E.J.A. could not testify on his own behalf because of his age, the jury could certainly have used common experience to conclude that when McDuffie bit E.J.A., he caused E.J.A. the intense physical or mental pain required to be tortured under K.S.A. 2016 Supp. 21-5602(a)(1). Last, this conclusion seems all the more reasonable when one considers the other evidence supporting how McDuffie physically injured E.J.A. on April 30, 2014. For

the foregoing reasons, when viewed in the light most favorable to the State, a rational factfinder could have found McDuffie guilty beyond a reasonable doubt of committing child abuse by biting E.J.A.'s cheek.

*Did the Trial Court Err in Calculating McDuffie's CACF Fees?*

To review, at sentencing the trial court ordered that McDuffie pay a $400 fine to the CACF for each crime he committed against E.J.A. Because McDuffie had been convicted of committing five separate crimes against E.J.A., the trial court ordered that McDuffie pay a total of $2,000 to the CACF. McDuffie now argues that the trial court erred in calculating the amount of CACF fees he owed. McDuffie asserts that based on the plain language of K.S.A. 2016 Supp. 20-370(a), the provision that outlines fee payments to the CACF, the trial court could only require him to pay a single fee of $400 for all of his crimes committed against E.J.A. The State's analysis of McDuffie's argument is unhelpful as the State simply asserts that "nothing in the statute indicates there should only be one fee assessed per case" without any additional explanation or analysis.

*Standard of Review*

When reviewing the interpretation of a statute, appellate courts exercise unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The most fundamental rule of statutory interpretation is that the intent of the legislature governs. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). The first step of any statutory interpretation challenge is to attempt to ascertain the legislature's intent through the plain language of the statute. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). Appellate courts do this by giving common words their ordinary meanings. *Barlow*, 303 Kan. at 813.

29

Appellate courts must refrain from engaging in statutory construction if the legislature's intent is clear from the plain language of the statute. *Barlow*, 303 Kan. at 813. In other words, appellate courts may only resort to statutory construction when the meaning of the statute is unclear and ambiguous. One cannon of statutory construction is that "legislatures are presumed to be familiar with court precedent and to expect that its enactments will be interpreted accordingly." *Kleypas*, 305 Kan. at 261. Appellate courts may also look to a statute's legislative history when the plain language of the statute does not definitively establish the legislature's intent. *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009). Additionally, appellate courts must "strictly construe criminal statutes in favor of the accused so long as doing so results in a reasonable and sensible expression of legislative intent." *State v. Herndon*, 52 Kan. App. 2d 857, 862, 379 P.3d 403 (2016), *petition for rev. filed* August 15, 2016.

*Preservation*

McDuffie concedes that he never objected to the trial court's order that he pay a $400 fee for each crime he committed against E.J.A. Nevertheless, he asserts that this court can address his argument for the first time on appeal because it involves a question of law arising from proved or admitted facts that is finally determinative of his case. This court has recognized that an argument raised for the first time on appeal which involves only a question of law arising on proved or admitted facts that is finally determinative of the case may be raised for the first time on appeal. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). Additionally, as McDuffie has pointed out in his brief, in *State v. Zugg*, No. 96,478, 2007 WL 1413133, at *2 (Kan. App. 2007) (unpublished opinion), this court invoked this exception when considering a defendant's challenge to the calculation of a different fee imposed at sentencing. Although the *Zugg* case involved a different fee, like the defendant in *Zugg*, McDuffie's challenge involves only a question of law on proved or admitted facts. As a result, this court will address McDuffie's argument.

30

*Background on K.S.A. 20-370(a)*

The legislature enacted K.S.A. 20-370 in 2004. See L. 2004, ch. 142, sec. 1. K.S.A. 20-370 states:

"(a) Any defendant convicted of a crime under chapters 34, 35 or 36 of article 21 of the Kansas Statutes Annotated, and amendments thereto, in which a minor is a victim shall pay an assessment fee in the amount of $100 commencing on and after June 30, 2004, to the clerk of the district court. If it appears to the satisfaction of the court that payment of the assessment fee will impose manifest hardship on the defendant, the court may waive payment of all or part of the assessment fee. All moneys received pursuant to this section shall be remitted to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the children's advocacy center fund established in subsection (b).

"(b) There is hereby established the children's advocacy center fund in the state treasury which shall be administered by the attorney general. All expenditures from the children's advocacy center fund shall be for operating expenditures of children's advocacy centers in the state that are eligible for funding pursuant to law. All expenditures from the children's advocacy center fund shall be made in accordance with appropriation acts upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the attorney general or the attorney general's designee."

Accordingly, subsection (b) established the CACF. Subsection (a), on the other hand, created the CACF fee that defendants convicted of crimes against minors must pay.

Although subsection (b) has remained the same, in 2013 the legislature amended subsection (a) to read as follows:

"(a) On or after July 1, 2013, any defendant convicted of a crime under chapter 21 of the Kansas Statutes Annotated, and amendments thereto, in which a minor is a

31

victim shall pay an assessment fee in the *amount of $400*, to the clerk of the district court. All moneys received pursuant to this section shall be remitted to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the children's advocacy center fund established in subsection (b)." (Emphasis added.) L. 2013, ch. 117, sec. 1.

Thus, the 2013 amendments to K.S.A. 20-370(a) increased the fee a defendant must pay from $100 to $400 and deleted the provision allowing courts to waive any or all of the CACF fee upon defendant's showing of financial hardship. Since the 2013 amendments, there have been no further amendments to K.S.A. 20-370.

### *McDuffie's CACF Fees were Calculated Correctly*

As a preliminary note, McDuffie has correctly asserted that this is an issue of first impression as no courts have addressed the calculation of CACF fees before. In fact, it seems no appellate court has even cited K.S.A. 20-370 in an opinion before. Thus, there is no caselaw directly on point for this court to rely on.

As to McDuffie's underlying argument, McDuffie's argument turns on his interpretation of K.S.A. 2016 Supp. 20-370(a)'s phrase that defendants are required to pay "*an* assessment fee." McDuffie contends that because K.S.A. 2016 Supp. 20-370(a) states that the court must impose "*an* assessment fee," the court could not impose a fee for each offense he committed against E.J.A. McDuffie also compares K.S.A. 2016 Supp. 20-370(a) to K.S.A. 2016 Supp. 28-176(a), the provision that outlines Kansas Bureau of Investigation (KBI) laboratory analysis fees. K.S.A. 2016 Supp. 28-176(a) states that a defendant must pay a laboratory analysis fee "for every individual offense." McDuffie contends that based on the "for every individual offense" language in K.S.A. 2016 Supp. 28-176(a), if the legislature had intended for defendants to pay a CACF fee for every

32

offense committed against a minor, the legislature would have included the "for every individual offense" language in K.S.A. 2016 Supp. 20-370(a).

The relevant language of K.S.A. 2016 Supp. 20-370(a) at issue states that "any defendant convicted of *a crime* under chapter 21 . . . in which a minor is a victim, shall pay *an assessment fee* in the amount of $400 to the clerk of the district court." Accordingly, the relevant language that McDuffie is relying on and this court must address is the article "a," which precedes the term "crime," and the article "an," which precedes the term "assessment fee." McDuffie believes that the article "an" in "an assessment fee" mandates a single fee.

McDuffie is correct that the article "an" may be used to denote that there is only one of something. Yet, McDuffie contends that the article "an" is synonymous with the number "one" without comment on the meaning of the article "a" before "crime." The article "a" also may be used to denote that there is only one of something. The articles "a" and "an" can have identical meanings; "a" is the article used before most words starting with a consonant while "an" is the article used before words beginning with a vowel sound. If one interprets both the articles "a" and "an" in K.S.A. 2016 Supp. 20-370(a) as being synonymous with the number "one," this court could read K.S.A. 2016 Supp. 20-370(a) as stating that defendants convicted of "one crime" against a minor shall pay "one assessment fee." This interpretation, in conjunction with the fact there is no language within K.S.A. 2016 Supp. 20-370(a) prohibiting the imposition of multiple CACF fees for multiple crimes against minors, supports that the legislature created a one-to-one crime-to-fee ratio. This would mean that one crime against a minor would result in one fee, but two crimes against a minor would result in two fees, and so on and so forth. Thus, McDuffie's interpretation of the meaning of the article "an" is not necessarily in his advantage as one could interpret this language as creating a one-to-one crime-to-fee ratio.

Furthermore, McDuffie's arguments fail to take into account our Supreme Court's prior assessment of the meaning of articles within statutes. In *State v. Henning*, 289 Kan. 136, 140, 209 P.3d 711 (2009), our Supreme Court addressed the difference between the articles "a" and "the," explaining:

"'A' is often referred to as an indefinite article, while 'the' is denominated a definite article. See Garner's Modern American Usage 1, 785 (2d ed. 2003). The word 'a' is 'used as a function word before singular nouns when the referent is unspecified.' Merriam Webster's Collegiate Dictionary 1 (11th ed. 2003). 'A' can also mean 'any.' Merriam Webster's Collegiate Dictionary 1. 'The' is 'used as a function word to indicate that a following noun or noun equivalent is definite or has been previously specified by context or by circumstance.' Merriam Webster's Collegiate Dictionary 1294."

The *Henning* court delved into the meaning of the articles "a" and "the" because Henning was challenging an amendment to K.S.A. 22-2501(c). K.S.A. 22-2501(c), as originally enacted, stated that following a lawful arrest, a law enforcement officer may search the person arrested for the purpose of "discovering the fruits, instrumentalities, or evidence of *the* crime." (Emphasis added.) In 2006, however, the legislature amended K.S.A. 22-2501(c) to allow officers to search a person for the purpose of "discovering the fruits, instrumentalities, or evidence of *a* crime." (Emphasis added.) When Henning was arrested, the arresting police officer conducted a search in an attempt to find evidence of any crime that Henning may have committed, not just the crime he had been arrested for committing. *Henning*, 289 Kan. at 139.

The trial court found that the officer's search was invalid because the officer did not limit his search to evidence of the crime that Henning had just committed. *Henning*, 289 Kan. at 139. The State appealed to this court, and this court reversed the trial court. *State v. Henning*, 38 Kan. App. 2d 706, 713, 171 P.3d 660 (2007), *rev'd based on unconstitutionality of statute*, 289 Kan. 136, Syl. ¶ 6, 209 P.3d 711 (2009). This court explained that because the word "a" is an indefinite article, the officer could search for

34

evidence of "*any* unspecified crime." *Henning*, 38 Kan. App. 2d at 713. Henning filed a petition for review with our Supreme Court, which was granted. Our Supreme Court ultimately affirmed this court's interpretation that the article "a" before crime meant "any unspecified crime." Our Supreme Court decided that it was unclear what the legislature exactly intended by using the article "a"; thus, our Supreme Court examined the legislative history of K.S.A. 22-2501(c) to determine why the legislature changed the statute from allowing an officer to search for evidence of "the crime" as opposed to evidence of "a crime." *Henning*, 289 Kan. at 142-44. Our Supreme Court concluded that the legislative history did not definitively explain the amendment. *Henning*, 289 Kan. at 144.

Yet, the *Henning* court emphasized that the amendment came after an earlier opinion from our Supreme Court in *State v. Anderson*, 259 Kan. 16, 910 P.2d 180 (1996), where the court had held that the article "the" preceding the term "crime" meant that the officer could search only for evidence of the specific crime the defendant had been arrested for committing. *Henning*, 289 Kan. at 144-45. Citing the rule of statutory construction that legislatures are presumed to be familiar with appellate court precedent, the *Henning* court determined that the legislature intended to allow officers to conduct a search for any crime by changing K.S.A. 22-2501(c) from stating an officer could search for evidence of "the crime" to evidence of "a crime." *Henning*, 289 Kan. at 144-45. Thus, the *Henning* court held that the article "a" before the term "crime" in K.S.A. 22-2501(c) was equivalent to the word "any." Then, our Supreme Court went on to hold K.S.A. 22-2501(c) unconstitutional based on the United States Supreme Court's recent decision in *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). *Henning*, 289 Kan. at 148-49.

Similarly, in *State v. Horn*, 291 Kan. 1, 8-9, 238 P.3d 238 (2010), our Supreme Court examined an amendment to a statute that replaced the words "the trial" with "a trial." The specific statute at issue was K.S.A. 21-4718(b)(4), and under the 2002

35

amendment, when an upward durational departure was requested, the court was required to determine if evidence of aggravating factors should be "presented to a jury" as opposed to "the jury." *Horn*, 291 Kan. at 8-9. The *Horn* court held that by replacing "the" with the indefinite article "a," it was readily apparent that K.S.A. 21-4718(b)(4) now gave the defendant the option of presenting evidence of aggravating factors to the jury that found the defendant guilty or a different jury. 291 Kan. at 8-9.

Turning our attention back to McDuffie's argument about K.S.A. 2016 Supp. 20-370(a), although this case does not involve an amendment that resulted in an article changing, we note that the *Henning* and *Horn* courts' analysis of the meaning of articles is somewhat helpful. Under the *Henning* and *Horn* courts' analysis of the articles "a" and "an," the legislature must have intended for the article's referent to be interpreted more broadly than when the article "the" is used because the referent following the articles "a" or "an" is unspecified. Furthermore, although McDuffie's argument has assumed that the article "an" is synonymous with the number one, the *Henning* and *Horn* courts' analysis explained that the articles "a" and "an" often precedes an unspecified referent that is not limited in number. For example, in this case, when the legislature stated that defendants convicted of "a crime" against a minor shall pay "an assessment fee," it is possible that the legislature intended that defendants convicted of "*any* crime" against a minor must pay "*one* assessment fee" regardless of the number of crimes that were committed against a minor.

Construction of the article "an" before the term "assessment fee" in this manner, however, does not make sense. This is because the legislature never intended that defendants convicted of "*any* crime" against a minor pay "*any* assessment fee." Instead, the legislature clearly wanted defendants to pay a specific assessment fee to the CACF; the question this court must determine is simply whether defendants convicted of more than one crime against a minor are required to pay more than one assessment fee to the CACF. This court must construe statutes in a manner that does not result in unreasonable

36

results. *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014). As a result, although the legislature could have intended for the article "a" before the term "crime" to mean "any," it is clear the legislature did not intend the article "an" before the term "assessment fee" to mean "any." In turn, the use of the article "an" before the term "assessment fee" speaks to the number of fees that a defendant must pay, which is one fee. Therefore, one could interpret K.S.A. 2016 Supp. 20-370(a) to mean that defendants convicted of "any crime" against a minor shall pay "one assessment fee" to the CACF.

Accordingly, it seems that K.S.A. 2016 Supp. 20-370(a) may be interpreted in two ways. First, it may be interpreted as creating a one-to-one ratio, where defendants convicted of one crime against a minor are required to pay one fee, but defendants convicted of multiple crimes against minors are required to pay the number of fees equal to the crimes committed against minors. Alternatively, it may be interpreted as requiring a defendant convicted of any unspecified number of crimes against minors to pay just one assessment fee. Consequently, the legislature's intent is not fully discernable from the plain language of K.S.A. 2016 Supp. 20-370(a), and this court can turn to the statute's legislative history.

In the end, K.S.A. 20-370's legislative history establishes that the legislature intended to create a one-to-one crime-to-fee ratio requiring defendants to pay a CACF assessment fee for each crime they are convicted of committing against a minor. Testimony from different committee hearings establishes that the purpose of K.S.A. 20-370(a)'s CACF assessment fee is (1) to punish defendants and (2) to raise revenue.

Regarding punishment purposes, when enacted in 2004, the House's Corrections and Juvenile Justice Committee and the Senate's Ways and Means Committee received testimony about holding defendants who abused children financially accountable. Based on the legislature's enactment of K.S.A 20-370(a), it is readily apparent that the legislature agreed that defendants should be punished financially for the crimes that they

37

commit against minors. Regarding revenue purposes, the 2013 amendments to K.S.A. 20-370(a) develop that the other goal is to raise revenue for the CACF. Once more, the 2013 amendments to K.S.A. 20-370(a) increased the CACF assessment fee from $100 to $400. Moreover, the 2013 amendments deleted the provision allowing courts to waive the CACF assessment fee upon a showing of hardship. See L. 2013, ch. 117, sec. 1. During a 2013 hearing in the Senate Judiciary Committee, Senator David Haley questioned whether the fee should be increased so much, and Senator Greg Smith responded that undue financial hardship for convicted child abusers was not an issue of concern. The fact that the 2013 amendment to K.S.A. 20-370(a) was passed establishes that the majority of the legislature agreed with Senator Smith.

Senator Smith also sent a letter supporting the 2013 amendment to the House Appropriations Committee. In this letter, Senator Smith emphasized that the CACF assessment fee is rarely imposed because trial courts generally waive it. Senator Smith also emphasized that raising the CACF assessment fee to $400 would be "roughly the cost of a forensic exam." It seems Senator Smith was making reference to testimony received from the Executive Director of the state network of CACFs, who had testified that a $400 fee was "consistent with the 'KBI fee' levied on offenders for processing collection kits in cases including sexual abuse." Senator Smith also advocated for the amendments in the House Appropriations Committee, where he was recorded as stating "that *fees* are not collected until *the party* is found guilty." (Emphasis added.) It must be noted, however, that a footnote to the committee hearing minutes states that testimony like Senator's Smith's testimony, which was recorded in the committee minutes as opposed to an attachment to the minutes, does not necessarily reflect a verbatim record of the testimony given.

Although it is unclear if this was the exact language Senator Smith used at the House Appropriates Committee, there is a major difference between discussing the defendant's payment of "fees" as opposed to the defendant's payment of "a fee." One

38

would assume that this difference was recognized, and the minutes, while not necessarily verbatim, accurately reflected the intent of those who testified. Under that assumption, Senator Smith's reference to "the party" paying "fees" is significant. By referring to "the party," it is clear that Senator Smith was speaking about a single defendant who was convicted of crimes against a child. By referring to "fees" in the plural, it is clear that Senator Smith was speaking about that same single defendant paying multiple fees. Accordingly, Senator Smith's testimony strongly indicates that the legislature intended defendants to pay a fee for each crime they committed against a minor. There would have been no reason for Senator Smith to reference multiple fees but only a single defendant if this were not the case.

Additionally, outside of Senator Smith's statement, the legislative history still supports that defendants convicted of multiple crimes against minors are required to pay more than one CACF fee. For example, because K.S.A. 2016 Supp. 20-370(a) was clearly enacted for revenue purposes, one would assume that the legislature intended for defendants to pay a fee for each crime committed against a minor. Ensuring defendants pay a fee per crime committed against a minor better serves the statute's goal of raising revenue. Stated another way, not ordering that defendants pay a fee per crime committed against a minor undercuts the statute's goal of raising revenue. This conclusion is additionally supported by Senator Smith's comment that he did not believe that defendants' financial hardships were an issue of concern when considering the imposition of a higher CACF fee and the ultimate removal of the hardship provision.

Moreover, the comparison of the CACF assessment fee to the KBI laboratory fee is also noteworthy. In his brief, McDuffie actually relies on the language in K.S.A. 2016 Supp. 28-176's KBI laboratory analysis fee statute, pointing out that this provision states that defendants must "pay a separate court cost of $400 for every individual offense." McDuffie's argument is that the legislature would have used similar language in K.S.A. 2016 Supp. 20-370(a) if the legislature had wanted defendants to pay a fee for each crime

39

committed against a minor. Yet, based on the legislative history of the 2013 amendments, it seems that the legislature believed that by amending the fee to $400, the CACF assessment fee would be comparable to the KBI laboratory analysis fee. Consequently, this indicates that the legislature wanted the CACF fee to be treated in a manner similar to the KBI laboratory analysis fee. As denoted by the language of K.S.A. 2016 Supp. 28-176, defendants may be ordered to pay a KBI laboratory analysis fee for each count they were convicted which requires the use of laboratory services. See *State v. Goeller*, 276 Kan. 578, 584, 77 P.3d 1272 (2003), o*verruled on other grounds by State v. Dicke*y, 301 Kan. 1018, 350 P.3d 1054 (2015). Thus, the legislature's belief that it was enacting a fee comparable to a KBI laboratory analysis fee further demonstrates that the legislature's intent was to create a one-to-one crime-to-fee ratio.

### *Conclusion*

In summary, the plain language of K.S.A. 2016 Supp. 20-370(a) allows for two interpretations. Under the first interpretation, defendants convicted of one crime against a minor are required to pay one fee, but defendants convicted of multiple crimes against minors are required to pay the number of fees equal to the crimes committed against minors. This is based on interpreting the articles "a" before the term "crime" and "an" before the term "assessment fee," as being synonymous with the number one as well as the lack of language in the statute preventing the imposition of multiple fees when the defendant has committed multiple crimes against minors. Under the second interpretation, defendants convicted of any crimes against minors, regardless of number, are required to pay just one assessment fee. By looking at K.S.A. 2016 Supp. 20-370(a)'s legislative history, however, it is clear that the legislature intended for a single criminal defendant convicted of multiple crimes against minors to pay a fee for each crime committed against minors. Accordingly, the first interpretation of K.S.A. 2016 Supp. 20-370(a) is the correct interpretation.

As a result, McDuffie's argument that the trial court erred by imposing a CACF assessment fee for each of the five crimes he committed against E.J.A. is incorrect. Because McDuffie's argument is incorrect, the trial court's order requiring McDuffie to pay $2,000 in fees to the CACF was proper.

*Did the Trial Court Err in Sentencing McDuffie?*

Finally, McDuffie argues that the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution when it used his criminal history to lengthen his prison sentence without first proving his criminal history to a jury beyond a reasonable doubt. McDuffie argues that the trial court was required to do this based on the United States Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). McDuffie recognizes that our Supreme Court has rejected this argument in *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002), but he raises this issue to preserve it for federal review.

In *Ivory*, our Supreme Court held that *Apprendi* "does not apply where the sentence imposed was based in part upon a defendant's criminal history score under . . . the Kansas Sentencing Guidelines Act." 273 Kan. 44, Syl. This court is duty bound to follow our Supreme Court precedent absent some indication that our Supreme Court is moving away from its previous holding. *Singleton*, 33 Kan. App. 2d at 488. There is no indication that our Supreme Court is departing from its holding in *Ivory*. Therefore, based on *Ivory* precedent, this court rejects McDuffie's argument that the trial court violated his constitutional rights.

Affirmed.