NOT DESIGNATED FOR PUBLICATION

No. 115,774

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GERALD D. ELKINS, JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed June 23, 2017. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., GREEN and BUSER, JJ.

*Per Curiam*: Bluegrass music legend Bill Monroe remembered lost love when he sang, "I traced her little footprints in the snow." In a less romantic setting, the police employed this same tactic in solving the crimes at issue in this case.

Around 6:30 a.m. on a snowy winter morning, Officers Jared Thomas and Josh Gilmer were dispatched to Calvary Towers in Wichita in response to a report of a suspicious character carrying a large television toward Calvary Towers. When the officers arrived, the caller, Rance Kindred, told them that the suspicious character, a black male with blue jeans and a tan jacket, had entered Calvary Towers. Officer Thomas

1

saw a single set of footprints in the freshly fallen snow leading to the door of Calvary Towers and wet marks from the snow on the floor inside.

Meanwhile, Officer Gilmer retraced the path of these footprints in the snow back from Calvary Towers. He noted that the tracks in the snow did not have a distinctive tread pattern, but the track from one foot "had a drag pattern to it." The footprints led him back to the home of Edna Brown. Brown's front door was open, and she was asleep when the police arrived. She awoke and discovered that her back door had been damaged and her television was missing. After investigating Brown's home, the officers continued to follow the footprints, which led to two vacant houses that had been forced open and to the house of Todd Dalton. Dalton reported that around 5:30 that morning a black man with a short afro and wearing a light, white-colored jacket and blue jeans had asked him if there was anything he needed hauled away. Dalton said he did not.

Later that day, Officer Chad Burnett went to Calvary Towers to interview Robert Daquino, the property manager. Daquino provided a surveillance video that showed Elkins carrying a television into the building at 6:23 a.m. that morning. Another man joined Elkins in the lobby, and Elkins gave him the television. The men took the television to apartment 209. When they left about 10 minutes later, they no longer had the television. The video also showed that Elkins had brought three other televisions to apartment 209 since 1:30 a.m. that morning.

Upon seeing Elkins in the video, Daquino told the officers that he had ejected Elkins from the building just several minutes earlier. Officer Burnett contacted dispatch with a description of Elkins: a black male with a small afro and large eyes wearing a white or off-white coat, blue jeans, a white t-shirt with blood on it, and sagging pants that revealed tan boxers. Officer Burnett also reported that Elkins had a distinctive walk, where "his left leg kind of swooped out to the side." The police found Elkins, who matched the description, walking down a nearby street and took him into custody.

2

Yiekia Edmond in apartment 209 told the officers that Elkins had offered to sell her some televisions. She bought four televisions from Elkins for the purpose of reselling them; the first one around 2 a.m. and the last one around 7 a.m. that morning. Another man helped Elkins deliver them to her. Edmond described Elkins as having large eyes and a small afro and said that he was wearing a t-shirt with blood on it.

One of the televisions from Edmond's apartment had been stolen from Brown that morning. Another belonged to Diana Alexander. Alexander had called the police early that morning, and the police arrived at her home at 4:52 a.m. She told them that she woke up to find a man in her house. She struggled with the man but then let him leave when he told her he had "come in the house as a joke." She initially told the police that nothing was missing from her house, but about 30 minutes later she called the police again to report that her television was missing. Although it had recently snowed, the responding officer did not notice any footprints outside the house. Alexander later testified that while her television was found in Edmond's apartment, Elkins was not the man who had taken it from her home.

While in custody, Elkins told the police that he had "helped a lady in Room 209 carry two televisions from her car . . . up to 209." When the police told him that the woman in 209 had said that she bought the televisions from Elkins, he changed his story and said that his friend J-Mac had asked him for help carrying the televisions. Elkins said he knew the televisions were stolen but denied stealing them or selling them. The police noted that the soles of Elkins' shoes were worn, which would explain why the footprints in the snow did not have any distinctive tread markings.

Elkins was arrested and charged with aggravated burglary, criminal damage to property, and theft for breaking into Brown's home and taking her television. The State also charged Elkins with the theft of Alexander's television under an aiding and abetting theory. The jury convicted him on all charges, and he was sentenced to a controlling term

3

of 120 months in prison on the aggravated burglary conviction and concurrent 6-month sentences for the other three crimes.

Elkins' appeal brings the matter to us. He raises four claims of error on appeal: (1) the insufficiency of the evidence to support these convictions; (2) the violation of his constitutional right to confront Rance Kindred, whose hearsay statements were admitted at trial; (3) the prosecutor's improper argument in closing; and (4) cumulative errors.

*Sufficiency of the Evidence*

Elkins claims he could not be convicted based on "speculative circumstantial evidence" without any physical evidence, DNA evidence, fingerprints, or footprint analysis. In considering this claim, we review the evidence in the light favoring the State to determine whether we are convinced that a rational factfinder could have found Elkins guilty beyond a reasonable doubt based on the evidence introduced at trial. See *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015).

To support an aggravated burglary conviction, the State needed to show that Elkins knowingly entered a home where a human being—Edna Brown—was present without authority and with the intent to commit a theft therein. See K.S.A. 2016 Supp. 21-5807.

To support a criminal damage to property conviction, the State needed to show that Elkins knowingly damaged Brown's door without her consent. See K.S.A. 2016 Supp. 21-5813.

To support a conviction for the theft of Brown's television, the State needed to show that Elkins exerted unauthorized control over the television with the intent to permanently deprive Brown of it. See K.S.A. 2106 Supp. 21-5801.

To support a conviction for the theft of Alexander's television on an aiding and abetting theory, the State needed to show that Elkins gained control over the property, knowing that it had been stolen by another, with the intent to permanently deprive Alexander of the property. See K.S.A. 2016 Supp. 21-5801. "Possession by an accused of recently stolen property is sufficient to sustain convictions for burglary and theft where a satisfactory explanation is not given." *State v. McFall*, 219 Kan. 798, 799, 549 P.2d 559 (1976).

Elkins does not dispute that he had possession of the televisions merely hours after they had been stolen. He admitted that he knew they were stolen. His explanation for possessing them clearly was not satisfactory to the jury. Without recounting all the other facts recited above, including the video and footprint evidence, it is clear that there is ample circumstantial evidence to establish the elements of these crimes, including the State's aiding and abetting theory of guilt. A conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Viewing the evidence in the light favoring the State, there was sufficient evidence to support Elkins' convictions.

*Right of Confrontation*

Rance Kindred, the man who made the 911 call, was unavailable to testify at trial. Over Elkins' objection, Officer Gilmore testified that he went to Calvary Tower because he was dispatched there in response to Kindred's 911 call about a suspicious character carrying a television down 25th Street. Officer Gilmore continued:

> "As I pulled into the parking lot at the Calvary Towers, our calling party, Rance Kindred, made contact with me and he told me there was a man . . . looked about five ten, 160 pounds . . . a black male . . . wearing a tan jacket with a hood and blue jeans walking down the street with a TV in his hands and he walked into the Calvary Towers."

5

Elkins' objection was that the testimony was hearsay. He did not object at trial based upon the testimony violating his rights under the Confrontation Clause. Now, on appeal, Elkins raises this constitutional issue for the first time. Generally, a party cannot assert a new legal theory for the first time on appeal. A party wishing to raise a new issue on appeal must explain "why the issue is properly before the court." Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34). In *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015), our Supreme Court held that Rule 6.02(a)(5) will be strictly enforced. Here, Elkins does not explain why he is raising the Confrontation Clause issue for the first time on appeal.

But even if we were to consider this contention, in our de novo review of this issue we would determine that Elkins' argument is not persuasive. The Confrontation Clause contained in the Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall have the right to confront the witnesses against him or her. The Confrontation Clause prohibits the admission of *testimonial* statements of a witness who did not appear at trial unless the witness was unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The difference between a testimonial and a nontestimonial statement was explained in *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006):

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

Applying this test to our present facts, it is clear that Kindred's call to the police was not testimonial. Kindred's primary purpose in calling the police was to report an

ongoing emergency, a suspected theif apparently carrying away a television. Kindred's description of the man, which he provided to the officers that arrived at Calvary Towers following his call, was intended to help the police meet the ongoing emergency by giving identifying characteristics of the man he had seen with the television.

Besides, the protection of the Confrontation Clause applies to attempts to admit hearsay evidence. See *State v. Araujo*, 285 Kan. 214, 218, 169 P.3d 1123 (2007). Hearsay is "[e]vidence of a statement which is made other than by a witness while testifying at [a] hearing, offered to prove the truth of the matter stated . . . ." K.S.A. 2016 Supp. 60-460. Here, the court allowed Officer Gilmore to testify about Kindred's statements not to prove the truth of the matter asserted, *i.e.*, that a man with a certain description was carrying a television, but to explain the actions of the officers after receiving the report. Thus, the Confrontation Clause does not apply.

But even if Kindred's statements were testimonial hearsay, a Confrontation Clause violation may be found to be harmless. *State v. Bennington*, 293 Kan. 503, 524, 264 P.3d 440 (2011). Here, given the overwhelming evidence from the video recordings, the footprint evidence, and the testimony of the other witnesses, including Elkins' own admissions, we are satisfied beyond a reasonable doubt that admission of Kindred's statements did not affect the outcome of the trial. See *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). Even if properly preserved, Elkins' constitutional argument based on the Confrontation Clause would not prevail.

*Closing Argument*

Elkins argues that the prosecutor misstated the facts and evidence during her closing argument, thereby denying Elkins his right to a fair trial. We evaluate this claim using the two-part test set forth in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, we determine whether the prosecutor's comments were outside the wide

latitude allowed in discussing the evidence. Then, if the prosecutor's remarks exceeded those bounds, we apply the constitutional harmless error test to determine whether the error prejudiced the defendant's right to a fair trial. 305 Kan. at 109.

During closing argument, the prosecutor said:

"The defendant's story is that he helped a lady carry these . . . TVs in from her gray car. That's all four TVs at one time at 6:30 in the morning. But you don't see that on video, do you? The cops don't say that that's what happened at all. *Initially that would at least explain why his fingerprints are on all four of the TVs.* But then when the cop confronts him and says, oh, yeah, well, that lady says she bought all four of those TVs from you, then he says, oh, well, in this case I was just helping a guy carry all four TVs in from the parking lot from a red Jeep." (Emphasis added.)

The State did not present evidence at trial that Elkins' fingerprints were on the televisions. But this is entirely immaterial. There was never any question that Elkins handled the televisions. Elkins did not deny it. The surveillance video and witness testimony established that Elkins had possession of the televisions. Elkins' defense theory was that he was helping someone move the televisions into Calvary Towers. The prosecutor's remark in closing did not deprive Elkins of a fair trial.

*Cumulative Evidence*

Finally, Elkins argues that cumulative errors denied him a fair trial. But here, there were not multiple trial errors to accumulate. See *State v. Hilt*, 299 Kan. 176, 200, 322 P.3d 367 (2014). Thus, the cumulative error doctrine does not apply.

Affirmed.

8